14 F.3d 601
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Morris R. GARDNER, Plaintiff-Appellant,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
et al., Defendants-Appellees.
 No. 93-3070.
 United States Court of Appeals, Sixth Circuit.
 Dec. 21, 1993.
 
 Before: KENNEDY, MILBURN, and GUY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff, Morris R. Gardner, appeals from the district court's order denying his motion for summary judgment and granting the motion for summary judgment filed on behalf of the defendants Central States, Southeast and Southwest Area Pension Fund and eight individual trustees of that fund.[1] In this dispute over pension benefits covered by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Secs. 1001 et seq., the district court held the trustees' decision to deny the payment of retroactive pension benefits was not arbitrary or capricious. For the reasons set forth below, we affirm.
 
 I. BACKGROUND
 
 2
 The Central States Pension Fund, a qualified trust pursuant to the Internal Revenue Code, provides pension benefits to union employees whose employers have agreed through a collective bargaining agreement to contribute monies to the fund. Gardner became a participant in the Central States Pension Fund in 1965 while employed at the Wonder Snack Foods Division of ITT Continental Baking Company, Inc.
 
 
 3
 On March 26, 1976, Gardner, who was 55-years old at that time, applied for an early retirement pension, listing his places of employment as follows: Wonder Snack Foods from 1965-1976, Paducah Milk Producers Association ("Dairymen") from 1957-1964, and Sealtest Foods from 1950-1957.
 
 
 4
 The Pension Payment Committee, which is responsible for initial eligibility decisions under the Central States Pension Plan (Plan), was able to confirm that Gardner had only 10 years of service credit attributable to the period he was employed at Wonder Foods. In order to qualify for benefits, however, 20 years of service as an employee was necessary, so the Pension Payment Committee asked Gardner to obtain employment verifications from Dairymen and Sealtest. Thus began an exchange of letters and documents among Gardner, the Pension Payment Committee, and Gardner's local union that lasted approximately three years. Eventually, the focus of these exchanges narrowed to determining whether Gardner was entitled to service credit for his seven years of employment at Dairymen.
 
 
 5
 On September 4, 1979, the Pension Payment Committee wrote Gardner a letter, notifying him of the rejection of his 20-year retirement benefit claim due to a "break in service" from August of 1958 through April of 1965. The committee found Gardner was self-employed during that period, and self-employment does not entitle one to service credit. The letter explained the break in service rules and referred Gardner to the definition of covered employment found in the Plan. The letter also referenced the appeals procedure.
 
 
 6
 More letters were exchanged in 1981 and 1984. For the most part, the letters sent from Gardner to the Pension Payment Committee challenged the calculation of his credited service. The Pension Payment Committee's letters in response basically reaffirmed its position.
 
 
 7
 On December 21, 1990, Gardner, through counsel, appealed the September 4, 1979 claim denial to the Benefits Claim Appeals Committee. On April 11, 1991, Gardner and counsel appeared before that committee. The committee ruled in favor of Gardner, finding that he was in employee status while working at Dairymen. The basis of the approval was new evidence submitted by Gardner and the clarification of previous inconsistencies. On April 18, 1991, Central States notified Gardner that he qualified for an early retirement pension on the basis of previously denied credit. Central States also requested Gardner's employment history since March 1979. Gardner's employment history can be briefly summarized. After first applying for pension benefits, Gardner continued to work for Wonder Foods until approximately March 17, 1979. From March of 1979 through May of 1992, Gardner was employed by various industries and trucking companies, including eight or nine years with Overnite Transportation Company as a security guard.
 
 
 8
 On May 24, 1991, Gardner's attorney requested the payment of Gardner's pension be made retroactive to January 1, 1983.[2] By letter dated June 11, 1991, Central States advised Gardner that he was eligible for a $550 per month benefit based on a retirement date of December 31, 1982, but that Gardner's employment with Overnite would be reviewed at the next meeting of the Reemployment Committee to determine if it was prohibited under the pension plan's reemployment rules.
 
 
 9
 Over the next six months, letters were exchanged between Gardner, the Reemployment Committee, and Overnite in an effort to determine whether Gardner had engaged in prohibited reemployment, which would preclude him from recovering any pension benefits for that period.
 
 
 10
 On November 7, 1991, the Reemployment Committee reviewed Gardner's claim and ruled that his work for Overnite was prohibited reemployment which subjected him to the Plan's permanent suspension of benefit rules. On November 16, 1991, Gardner appealed the denial of retroactive benefits to the Benefits Claim Appeals Committee. On February 9, 1992, Gardner was notified that the Appeals Committee also had denied his request for the payment of retroactive benefits.
 
 
 11
 Gardner appealed his retroactive benefits claim to the Pension Fund's Board of Trustees (Trustees). On April 22, 1992, Trustees determined that Gardner's employment with Overnite was prohibited reemployment, and his pension payments were not to be paid during all the periods of such reemployment, except to the extent (1) it was after his 65th birthday (January 2, 1986) and was restricted to less than 40 hours during a calendar month, or (2) his reemployment was after March 31, 1992.
 
 
 12
 On June 5, 1992, Gardner initiated this action, claiming the defendants wrongfully forfeited his retroactive pension benefits for the 12 years that elapsed since the improper denial of his claim for a 20-year (early) retirement. Gardner and the defendants both filed timely motions for summary judgment. The district court granted the defendants' motion for summary judgment.
 
 II. LEGAL STANDARD
 
 13
 We must first determine whether we review the Trustees' decision to deny retroactive pension benefits de novo or under the more deferential "arbitrary and capricious" standard. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held "a denial of benefits challenged under Sec. 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." The issue thus becomes whether the Trustees enjoyed the requisite "discretion" to insulate their decision from de novo review. We have interpreted Firestone to require that the plan "expressly" give discretionary authority to the administrator. Johnson v. Eaton Corp., 970 F.2d 1569, 1571 (6th Cir.1992); Perry v. Simplicity Eng'g, 900 F.2d 963, 965 (6th Cir.1990).
 
 
 14
 A review of Central States' pension plan does not disclose any language that gives the Trustees a clear grant of discretionary authority; nevertheless, the Plan references the Trust Agreement, thereby incorporating by cross-reference the provisions of the Trust Agreement. Specifically, Article IV, Section 17 of the Trust Agreement provides: "The Trustees, by majority action, shall have the power to construe ... the terms and regulations of the Pension Plan; and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers." In addition, Article V, Section 2 states: "The Trustees are vested with discretionary and final authority in making all [benefits or construction] decisions, including Trustee decisions upon claims for benefits by participants and beneficiaries of the Pension Fund ... and including Trustee decisions construing plan documents of the Pension Fund." The Trust Agreement clearly grants the Trustees the discretionary authority to resolve issues involving the interpretation and application of the Plan. Thus, the Trustees' decision to deny the payment of retroactive benefits is reviewable only for an abuse of discretion.
 
 
 15
 In reviewing a district court's granting of summary judgment in an ERISA case in which the abuse of discretion standard applies, we must determine whether there is any genuine issue of material fact as to whether the Trustees' actions were arbitrary or capricious. See Davis By and Through Farmers Bank & Capital Trust Co. v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 694 (6th Cir.1989), cert. denied, 495 U.S. 905 (1990). The decision of the trustees must be sustained as a matter of law unless Gardner can prove that their decision was arbitrary or capricious. See Baker v. UMWA Health and Retirement Funds, 929 F.2d 1140 (6th Cir.1991); Dennard v. Richards Group, Inc., 681 F.2d 306, 313 (5th Cir.1982).
 
 III. ANALYSIS
 
 16
 Gardner contends that because the defendants failed to meet the requirements of 29 U.S.C. Sec. 1133,[3] and because the defendants breached their duty to advise him of what was required to document his claim, his retroactive benefits cannot be forfeited. Even if we were to assume the truth of these assertions, we would not have to address their merits, for they would have no bearing on the outcome of this case. Gardner's claim for pension benefits was granted. At issue on appeal is whether he is entitled to retroactive benefits. In making this determination, we do not examine the actions that occurred prior to the decision to award benefits;[4] instead, our only concern is whether the decision to refuse to grant retroactive benefits was arbitrary or capricious.
 
 
 17
 A pension plan's failure to make payments to an eligible participant generally constitutes an impermissible forfeiture; however, there are exceptions to this rule. The exception at issue in this case appears at ERISA Sec. 203(a)(3)(B), 29 U.S.C. Sec. 1053(a)(3)(B):
 
 
 18
 A right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that the payment of benefits is suspended for such period as the employee is employed, subsequent to the commencement of payment of such benefits--
 
 
 19
 ....
 
 
 20
 (ii) in the case of a multiemployer plan, in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced.
 
 
 21
 The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this subparagraph[.]
 
 
 22
 Gardner argues this exception is limited to employees who become reemployed "subsequent to the commencement of payment of such benefits." Because his receipt of payments did not begin until May 6, 1992, Gardner contends Sec. 203(a)(3)(B) was not implicated until that day, and his benefits accruing between March 1979 and April 1992 can not be forfeited.
 
 
 23
 In Atkins v. Northwest Airlines, Inc., 967 F.2d 1197 (8th Cir.1992), this same argument was proffered. In response, the Eighth Circuit noted:
 
 
 24
 Appellants contend [section 203(a)(3)(B) ] applies only to persons who have retired, started receiving pension benefits, and then resumed work. The Department of Labor, however, has interpreted this provision to include persons who have continued to work past retirement age and, therefore, have never started receiving benefits.
 
 
 25
 [T]he employment of an employee, subsequent to the time the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment, results in section 203(a)(3)(B) service.
 
 
 26
 29 C.F.R. Sec. 2530.203-3(c)(1) (1991). Section 203(a)(3)(B) refers to the period of suspension that the employee is employed "subsequent to the commencement of such benefits." 29 U.S.C.A. Sec. 1053(a)(3)(B) (West Supp.1992). On its face, it is unclear whether the statute refers strictly to employees who were reemployed after the commencement of benefits, or whether it refers also to employees who remained employed after pension eligibility began. The Department of Labor interpreted the statute to include both types of employees. Since we find the statute ambiguous, we must accede to a permissible construction of the statute by the Department.
 
 
 27
 Id. at 1201-02 (citation omitted). For the same reasons, we find Sec. 203(a)(3)(B) applies to employees as of the time pension eligibility is determined to have begun, and that Gardner is subject to its provisions as of March 1979.
 
 
 28
 Gardner also asserts that the withholding of benefits is in violation of the Plan's own plain language.[5] He notes the Plan only permits the forfeiture of benefits of a pensioner,[6] and a participant does not become a pensioner until the day "he begins to receive payment of the retirement pension for which he is eligible." Section 1.25 (emphasis added). Thus, because he was not a pensioner until he began to receive payments, his retroactive benefits cannot be forfeited.
 
 
 29
 We find this argument unpersuasive; common sense and fairness suggest the interpretation sought by the defendants is the correct one. It goes without saying that only people receiving benefits can lose them. In practice, this requires that an applicant's status first be determined, and then the rest of the plan, including suspension and forfeiture provisions, be applied. In other words, once it has been determined that an applicant qualifies for benefits, the other plan provisions contemporaneously are employed. When retroactive benefits are awarded, all of the plan provisions are automatically applied as of the retroactive date. Thus, since Gardner qualified for retroactive benefits, he should not be exempt from the forfeiture provisions of the Central States Pension Plan.
 
 
 30
 Having determined Gardner is not immune from the reaches of section 4.14, we must now look at 4.14 itself. Section 4.14 states, in pertinent part:
 
 
 31
 Section 4.14 REEMPLOYMENT AND SUSPENSION OF BENEFITS RULES
 
 
 32
 (a) A Pensioner shall have his benefit payments suspended for any calendar month in which he works in "Prohibited Re[e]mployment" ... except that, if he has reached his Vested Pension Retirement Date he may work in Prohibited Reemployment without having his benefit payments suspended if [he meets one of three conditions]:
 
 
 33
 ....
 
 
 34
 A Pensioner shall permanently lose his rights to any benefit payments which are suspended because of his work in Prohibited Reemployment.
 
 
 35
 Section 4.14 authorizes the suspension of benefits when a participant engages in prohibited reemployment. Even if a participant has not reached the vested retirement pension date, which is normally one's 65th birthday,[7] the participant must still be working in prohibited reemployment before his benefits can be suspended. This is in contrast to Department of Labor ("DOL") regulations, which were passed pursuant to ERISA Sec. 203(a), that state: "A plan may provide for the suspension of pension benefits which commence prior to the attainment of normal retirement age ... for any reemployment and without regard to the provisions of Section 203(a)(3)(B)[.]" 29 C.F.R. Sec. 2530.203-3(a) (emphasis added). See also Geib v. New York State Teamsters Conference Pension, 758 F.2d 973, 977 (3d Cir.1985) ("the nonforfeitability provisions of Sec. 203 do not apply until normal retirement age is reached."); Dennis v. Board of Trustees of Food Employers Labor, 620 F.Supp. 572, 576 (M.D.Pa.1985) (finding that "the Board could have legally prohibited [the applicant], as a person who has not yet attained normal retirement age, from receiving pension benefits upon any reemployment."); Chambless v. Masters, Mates & Pilots Pension, 571 F.Supp. 1430, 1441 (S.D.N.Y.1983) ("The case law thus makes clear that section 203(a) provides no protection against the suspension of benefits of plan participants ... who have not yet reached normal retirement age."). Thus, without running afoul of Sec. 203(a), Central States need not have placed any conditions on the forfeiture of benefits for participants who become reemployed prior to reaching normal retirement age. Nevertheless, section 4.14 does limit the forfeiture of benefits in such situations to those engaged in "prohibited" reemployment, and even though Central States has chosen to be more generous than it need have been, it must still live up to the terms of its Plan.
 
 
 36
 The Trustees found Gardner's retroactive benefits were forfeited because his job as a security guard for Overnite fell within the Plan's definition of prohibited reemployment. By letter dated May 6, 1992, the Trustees stated:
 
 
 37
 work requiring the same skills as those used by Fund participants while employed by contributing employers in the same metropolitan area in which Mr. Gardner worked is considered prohibited reemployment. Also, prior to March 1, 1990 this work was considered prohibited reemployment because Overnite transportation is engaged in the same business activities as a contributing employer.
 
 
 38
 The Trustees referred to March 1, 1990, the date the Plan was amended, because of the Plan's different definitions of prohibited reemployment. Prohibited reemployment was previously defined in section 4.12(f)(3) as "[w]ork in any capacity ... for an employer engaged in the types of business activities in which a Contributing Employer is engaged." Section 4.14(f)(3) currently defines prohibited reemployment as "[e]mployment in any position ... either in the same industry in which the Participant or Pensioner earned any Contributory Service Credit while covered by the Pension Fund, or in any other industry if the Participant or Pensioner is in the same job classification as are other Participants then employed by a Contributing Employer located within the same standard metropolitan statistical area."
 
 
 39
 The Trustees determined Gardner's employment at Overnite fell within both definitions of prohibited reemployment. The Trustees also found, for reasons that will be discussed later, that Gardner was not saved by section 4.14(a)'s safe-harbor. Thus, the Trustees ruled Gardner was not entitled to the payment of retroactive benefits for the time he worked at Overnite.
 
 
 40
 Although the record is less than clear as to the precise nature of Overnite's business activities, Overnite appears to be a non-union company in the transportation industry. We need only to review Gardner's employment history for proof that many transportation companies contribute to the Central States Pension Plan. Thus, it seems reasonable to conclude that Gardner's work for Overnite was with a company of the same type as that of other employers who contribute to the Plan. At a minimum, we cannot say that it was arbitrary or capricious for the Trustees to find that Gardner's work at Overnite was prohibited reemployment.
 
 
 41
 In denying the payment of retroactive benefits, the Trustees also ruled Gardner was not protected by the security guard exclusion to the prohibited reemployment rules. The Trustees stated in a May 6, 1992, letter to Gardner's counsel:
 
 
 42
 For your reference, I have enclosed a copy of the November 28-29, 1988 Board of Trustees' item concerning the prohibited reemployment exemption applicable to security guards. I would like to point out that the waiver which permits pensioners to work as security guards is specifically limited to traditional building security guard/night watchman. The Trustees did not consider Mr. Gardner's duties as a special agent/security guard to be typical of the security guard/night watchman classification that is part of the reemployment exclusion.
 
 
 43
 Under the security guard exclusion, reemployment as a security guard will not result in a suspension of pension benefits "as long as [one's] ... duties are limited to those of a building security guard or night watchman (this permitted re-employment does not apply to any Pensioner whose duties also include acting as a messenger or armed guard)."
 
 
 44
 An October 17, 1991, letter from Overnite to Gardner's counsel indicates Gardner was "employed as a Special Agent with [Overnite]." The letter also states:
 
 
 45
 Mr. Gardner serves as a Security Guard whose duty is to conduct constant surveillance of shipments at the hub which consist of products requiring extraordinary security (firearms, ammunition, pharmaceutical, retired currency, etc.).
 
 
 46
 Our loss prevention program requires that the nature of Mr. Gardner's work and the techniques employed by him remain confidential. We trust that you will not compromise the security of this program by divulging these facts to anyone who does not have an authentic need to know.
 
 
 47
 Special Agents are compensated at premium rates based upon the potential hazard, inconvenience, and duration of specific assignments.
 
 
 48
 In a letter to Central States, Gardner stated:
 
 
 49
 I was able to obtain irregular employment with Overnight Transportation Company at their Memphis, Tennessee hub as a security guard. My duties were to maintain constant watch on extremely valuable or extremely sensitive shipments to deter theft and/or pilferage as these shipments were handled at Overnite's Memphis hub.
 
 
 50
 I was "on call" and asked to report whenever extremely valuable or sensitive shipments required supplemental security to observe the transfer of specific shipments within the Memphis hub.
 
 
 51
 .... My sole responsibility was to observe the transfer and/or storage of particular shipments and to report anything unusual to the terminal manager.
 
 
 52
 Gardner contends the security guard exclusion should not be read to preclude him from its protection. The defendants argue the exclusion is limited to those activities traditionally associated with security guards and night watchmen, and Gardner was anything but a typical security guard. As the Trustees note, Gardner guarded only extremely valuable or sensitive shipments when he was called in to work, and the nature of his work required that his specific duties remain confidential.
 
 
 53
 Gardner's position is reasonable, but we also find the Trustees' interpretation of its policy to be reasonable. When previously faced with this dilemma, we held the trustees' interpretation must be allowed to control. Wells v. U.S. Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1253 (6th Cir.1991). The Trustees' interpretation and application of the security guard exclusion is not contrary to the plain language of the Plan; thus, we do not find the decision that Gardner's work at Overnite was not protected by the exclusion to be arbitrary or capricious.
 
 
 54
 As we referred to before, section 4.14(a) includes a safe-harbor for participants engaged in prohibited reemployment if they have reached normal retirement age and they meet three specified conditions. Gardner reached his normal retirement age on January 2, 1986. Thus, Gardner did not qualify for section 4.14(a)'s safe-harbor until that day and Central States had the authority to suspend his benefits prior to January 2, 1986. Moreover, the Trustees indicated Gardner was entitled to his benefits after March 31, 1992, pursuant to Plan section 4.15.[8] Accordingly, we only need to review Gardner's employment history from January 1986 through March 1992 to see if he qualified for section 4.14(a)'s safe-harbor. For if he did, he is entitled to the payment of retroactive benefits for that period. Before making this inquiry, however, we must address Gardner's contention that section 4.14(a) does not comport with ERISA and applicable DOL regulations.[9]
 
 
 55
 According to DOL regulations, passed pursuant to Sec. 203(a)(3)(B)(ii),[10] a multiemployer retirement plan may suspend a participant's benefits upon his reemployment if the participant in a month:
 
 
 56
 --Completes 40 or more hours of service ... in
 
 
 57
 --An industry in which employees covered by the plan were employed and accrued benefits under the plan as a result of such employment at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment, and
 
 
 58
 --A trade or craft in which the employee was employed at any time under the plan, and
 
 
 59
 --The geographic area covered by the plan at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment.
 
 
 60
 29 C.F.R. Sec. 2530.203-3(c)(2). In other words, a participant may have his benefits suspended if he works 40 or more hours in a month and his reemployment is in the same industry, in the same trade or craft, and in the same geographical region as that when he was covered by the plan. This provision is written in the conjunctive, and thus only applies when a pensioner, who has reached normal retirement age, engages in reemployment that meets each of the conditions set forth in the rule.
 
 
 61
 Gardner maintains that the Plan's definition of "Prohibited Reemployment" is written in the disjunctive, and thus is in violation of Sec. 203(a)(3)(B) and DOL regulations. To support this contention, Gardner relies exclusively on the December 29, 1992, decision in Whisman v. Robbins, 810 F.Supp. 936 (S.D.Ohio 1992), which was decided 18 days after summary judgment was ordered in this case. Bolstering Gardner's assertion is the fact that the same pension plan at issue in this case was also at issue in Whisman.
 
 
 62
 Whisman argued the Trustees had contravened DOL regulations by defining "Prohibited Reemployment" in the disjunctive rather than in the conjunctive. Id. at 947. The Whisman court quoted the pension plan as follows:[11]
 
 Section 4.12 REEMPLOYMENT
 AND SUSPENSION OF
 BENEFITS RULES
 
 63
 (a) A Pensioner shall have his benefit payments suspended for any calendar month in which he works in "Prohibited Reemployment" (as defined in subsection (f), below), except that, if he has reached his Vested Pension Retirement Date he may work in Prohibited Reemployment without having his benefit payments suspended....
 
 
 64
 A Pensioner shall permanently lose his rights to any benefit payments which are suspended because of his work in Prohibited Reemployment.
 
 
 65
 ....
 
 
 66
 (f) Prohibited Reemployment means any of the following:
 
 
 67
 (1) Work (in any capacity whether as an employee or self-employed individual) in any of the following job classifications: driver (regardless of the kind of vehicle driven), driver helper, warehouseman, dock worker, mechanic, or office clerical; or
 
 
 68
 (2) Work in the Same Trade or Craft in which the Pensioner was involved during any time he earned Contributory Service Credit; or
 
 
 69
 (3) Work in any capacity for a Contributing Employer or for an employer which was, at any time, a Contributing Employer or for an employer engaged in the types of business activities in which a Contributing Employer is engaged; or
 
 
 70
 (4) Work (including self-employment) involving the supervision or management of any employee who performs a job described in (1)
 
 
 71
 ....
 
 
 72
 Id. at 947-48. This language, the Whisman court found, "permits the suspension of benefits if the retiree's reemployment comes within any single suspension of benefits provision." Id. at 948. Thus, the court held that the plan did not comport with ERISA's requirement that all conditions be met, and the suspension of Whisman's benefits was necessarily arbitrary and capricious. Id.
 
 
 73
 The Whisman court's analysis, however, was incomplete. As previously discussed, ERISA distinguishes between the suspension of benefits for those who have reached normal retirement age and those who have not. Even the Whisman court itself noted this distinction earlier in its opinion, stating that "[t]he express language of [ERISA] illustrates that the Act requires only that pension benefits be nonforfeitable upon attainment of normal retirement age." Id. at 944.
 
 
 74
 The Central States Pension Plan makes this distinction, but the Whisman court bypassed this aspect of the plan because it only partially quoted section 4.12. The portion of the pension plan that the Whisman court deleted, most of subsection (a), creates a safe-harbor for persons who have reached normal retirement age. This is what is addressed by the conditions spelled out in Sec. 203(a)(3)(B) and DOL regulations. Thus, it is this portion of section 4.12, or section 4.14, that must be examined in reviewing the Plan.
 
 Section 4.14(a) provides:
 
 75
 (a) A Pensioner shall have his benefit payments suspended for any calendar month in which he works in "Prohibited Re[e]mployment" ... except that, if he has reached his Vested Pension Retirement Date he may work in Prohibited Reemployment without having his benefit payments suspended if:
 
 
 76
 (1) he works less than 40 hours during a calendar month; or
 
 
 77
 (2) he is not working in the "Same Trade or Craft" ... in which he was employed while earning Contributory Service Credit under this Pension Plan; or
 
 
 78
 (3) he is not working in the same "Geographical Area covered by this Pension Plan"[.]
 
 
 79
 Unfortunately, this language does not track the DOL regulations; thus, an analysis of Gardner's assertion requires a very careful reading of section 4.14.
 
 
 80
 Section 4.14(a) begins by stating a pensioner will have his benefits suspended while engaged in prohibited reemployment. Subsection (a) then carves out an exception to this rule for those pensioners who have reached normal retirement age and who meet one of the three specified conditions. Because the three conditions are written in the disjunctive, a pensioner need only meet one of them to qualify for the exception. In other words, if a pensioner has reached normal retirement age, he may engage in prohibited reemployment without having his benefits suspended so long as he meets one of the three conditions.
 
 
 81
 To state this another way, Gardner can engage in prohibited reemployment without having his benefits suspended so long as he works less than 40 hours during a calendar month, he is not working in the same trade or craft, or he is not working in the same geographical area. Thus, Gardner only needs to satisfy one of these three conditions to keep his pension and his job.
 
 
 82
 In other words, the only way Gardner can have his pension benefits suspended for engaging in prohibited reemployment is if he does not meet any of the three requirements. If Gardner works more than 40 hours during a calendar month and he is working in the same trade or craft and he is working in the same geographical area, then Gardner has not met any of the conditions and he cannot seek refuge in the safe-harbor to section 4.14. This is equivalent to the DOL regulations, which provide that a retiree's pension benefits may be suspended only if he works more than 40 hours during a calendar month, and he is reemployed in the same industry, and in the same trade or craft, and he is working in the same geographical area. Thus, we find that although section 4.14's language does not track the DOL regulations, it does comply with them.
 
 
 83
 Nevertheless, there remains one point on which section 4.14 might diverge from the requirements of ERISA or DOL regulations: section 4.14(a) does not list as one of its conditions that the pensioner work in the same industry. Thus, it seems that a participant could have his benefits forfeited even though his reemployment is not in the same industry, which would run afoul of ERISA and DOL regulations. A closer reading of section 4.14, however, reveals this is not true.
 
 
 84
 DOL regulations state: "The term 'industry' means the business activities of the types engaged in by any employers maintaining the plan." 29 C.F.R. Sec. 2530.203-3(c)(2)(i). The Central States Pension Plan limits the forfeiture of benefits to those employees engaged in prohibited reemployment. As previously discussed, the definitions of prohibited reemployment in both section 4.12 and section 4.14 incorporate the concept of "same industry." Thus, it follows that a participant cannot have his benefits forfeited unless he is engaged in the type of employment that is meant to be covered by DOL's "same industry" requirement. Accordingly, we find section 4.14 does meet the requirements listed in ERISA Sec. 203(a)(3)(B) and DOL regulations.
 
 
 85
 We must now determine whether Gardner has met the conditions specified in section 4.14(a). The only reference to these factors in the record, however, is to the hour requirement. In various letters from Central States to Gardner's counsel, and in minutes taken at a Pension Fund meeting, Central States observed Gardner would be entitled to his benefits once "he reduces his work hours to less than 40 hours per calendar month[.]" Notwithstanding the absence of any discussion regarding the other provisions, Gardner has not proffered any evidence to contradict the Trustees' findings that he has not met these requirements. Although the burden is upon the moving party to establish that no material facts are in genuine dispute, see Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir.1986), to preclude summary judgment, the non-moving party must demonstrate that an issue of material fact exists. Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir.1989). See also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Without any evidence that the Trustees' ruling on this issue was incorrect, we have no choice but to find that it was not arbitrary or capricious. See Allison v. Dugan, 951 F.2d 828 (7th Cir.1992).
 
 
 86
 Finally, we note Gardner devotes a considerable portion of his argument to contesting the district court's findings. He asserts the district court relied on reasons that were never articulated by the Trustees, such as Gardner's motive in working after his employment with Wonder Foods, the 12-year delay in his appeal, and his education, in reaching its decision that the Trustees' refusal to award retroactive benefits was not arbitrary or capricious.[12]
 
 
 87
 An ERISA case of this nature requires us to review the decision of the Trustees. In doing this, we have confined our review to the final decision of the Trustees and considered only the record before the Trustees when that decision was made. See Daniel v. Eaton Corp., 839 F.2d 263 (6th Cir.), cert. denied, 488 U.S. 826 (1988). Our role "is to focus on the evidence before the trustees at the time of their final decision and is not to hold a de novo factual hearing[.]" Id. at 267 (quoting Wardle v. Central States, Southeast and Southwest Areas Pension Fund, 627 F.2d 820, 824 (7th Cir.1980), cert. denied, 449 U.S. 1112 (1981). This court believes the Trustees possessed sufficient information with which to render an informed decision. The minutes of the Trustees' meeting of April 12, 1992, indicate the Trustees reviewed the actions of the Reemployment Committee and the Benefit Claims Appeals Committee. The Trustees concluded Gardner should not be paid retroactively because his job as a security guard for Overnite fell within the pension Plan's definition of prohibited reemployment.
 
 
 88
 Applying the abuse of discretion standard to the Trustees' fact finding and decision making process, we find that the Trustees followed the Plan as they were required to do, and that their decision was based upon a deliberate, principled reasoning process and supported by substantial evidence. This court also believes that the various hearings and appeals granted to Gardner were procedurally sufficient and fundamentally fair. Therefore, because the defendants acted reasonably and no genuine issue of material fact exists, we find the district court properly granted summary judgment in favor of defendants.
 
 
 89
 AFFIRMED.
 
 
 
 [1]
 The individual trustees are Marion W. Winstead, Robert C. Sansone, R. Jerry Cook, Harold D. Leu, Howard McDougall, Robert J. Baker, R.V. Pulliam, Sr., and Arthur H. Bunte, Jr
 
 
 [2]
 Gardner maintains that the record reflects he claimed a right to a benefit retroactive to his retirement date in 1979. However, a May 24, 1991, letter from Gardner's counsel to Central States clearly expresses his wish to have payments made retroactive to January 1, 1983
 
 
 [3]
 29 U.S.C. Sec. 1133 provides:
 In accordance with regulations of the Secretary, every employee benefit plan shall--
 (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
 (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.
 
 
 [4]
 Gardner disagrees with this assertion; he contends the denial of retroactive benefits is inappropriate when a claim initially is wrongfully rejected. In support of this proposition, he cites two cases: Bunnell v. New England Teamsters & Trucking Indus. Pension Fund, 655 F.2d 451 (1st Cir.1981), cert. denied, 455 U.S. 908 (1982), and Akers v. Arnett, 597 F.Supp. 557 (S.D.Tex.1983), aff'd, 748 F.2d 283 (5th Cir.1984). However, even if we were to assume that Gardner's claim initially was wrongfully denied, neither Bunnell nor Akers demand that retroactive benefits be granted
 In Bunnell, the court, construing the Veterans Reemployment Act, found Bunnell was entitled to full credit for his military services towards his pension. Bunnell, 655 F.2d at 452-53. The court added that because Bunnell was wrongfully told that his pension was not fully earned (and so he continued to work to complete the additional years necessary to earn his credits to qualify for a pension) he was entitled to retroactive payment of his pension to the time of his first application. The court found that "[b]ut for the unlawful refusal to pay, plaintiff would not have worked the additional three years." Id. at 453.
 Akers dealt with similar facts as in Bunnell, with the court again construing the Veterans Reemployment Act. Akers was a longshoreman until he enlisted and served three years in the Marine Corps. Akers, 597 F.Supp. at 559. After his discharge, he went back to work as a longshoreman and earned credits in the defendant pension fund. When he applied for a pension, the fund refused to credit his service for his time in the Marines, so he continued to work in order to gain additional service credits needed to retire. Id. at 559. The court found that the fund erred in denying him credit for service in the Marines, and held Akers was entitled to a retroactive pension because, "[b]ut for the unlawful denial of his pension rights," he would have not worked the additional years. Id. at 563 (discussing Bunnell ).
 Neither Bunnell nor Akers construed any relevant ERISA issues. Moreover, in both cases, the claimant continued to work at his job to earn additional credits to become eligible for a pension. Gardner, by contrast, accepted employment that was prohibited under the Pension Fund's Reemployment Rules, and he was not working at Overnight to earn additional credits to become eligible for a pension. Additionally, there was no evidence that either Bunnell or Akers contributed to their predicament. Gardner, on the other hand, failed to promptly respond to Central States' requests for additional information, and he waited almost 10 years before electing to appeal the initial denial. Accordingly, we find Gardner is not necessarily entitled to retroactive benefits even if we were to assume his claim initially was wrongfully denied.
 
 
 [5]
 On March 1, 1990, the Central States Pension Plan was amended. The only effect on our discussion is a renumbering of the Reemployment and Suspension of Benefit Rules Section from 4.12 to 4.14, and a change in the definition of Prohibited Reemployment under subsection (f). Thus, unless stated otherwise, all references to the Plan are to its current version
 
 
 [6]
 Section 4.14 states that "A Pensioner shall permanently lose his rights to any benefit payments which are suspended because of his work in Prohibited Reemployment." (Emphasis added.)
 
 
 [7]
 Section 1.35 provides:
 VESTED PENSION RETIREMENT DATE (NORMAL RETIREMENT DATE)
 (a) Normal Retirement Date of a Participant means the later of:
 (1) the 65th birthday of an Employee; or
 (2) the 5th anniversary of the date on which an Employee first became an Active Participant.
 
 
 [8]
 Section 4.15 provides:
 Section 4.15 PERIOD OF BENEFIT DISTRIBUTION
 The entire benefit and interest of a Participant shall be distributed in a period beginning no later than April 1 of the year after the calendar year in which his Retirement Date occurs or in which he attains age 70 1/2, whichever event is later, and ending no later than his death or the death of his spouse or other beneficiary eligible for a benefit according to this Pension Plan, whichever death is later.
 
 
 [9]
 Related to this inquiry is Gardner's assertion that the district court erred by granting summary judgment without any proof that the prohibited reemployment provision was enacted in conformity with traditional ERISA/LMRA trust principles or that the provision benefits the remaining participants of the fund
 This argument presupposes that a district court has a duty to invalidate pension plan provisions unless it first identifies specific evidence corroborating that a plan provision was adopted for the preservation of the financial integrity of the fund.
 We will not burden the district courts with this responsibility. Absent any evidence of a pension plan provision's illegality, a court is not required to engage in such a review. Cf. Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees, 740 F.2d 454 (6th Cir.1984), cert. denied, 469 U.S. 1109 (1985). Gardner's argument is even more tenuous, given that Congress has expressly chosen to allow the suspension of benefits for periods of reemployment. See Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032 (2d Cir.1985), cert. denied, 475 U.S. 1012 (1986) (upholding suspension of benefit rules).
 Gardner also suggests that the Trustees have a duty to demonstrate that the suspension of a retiree's benefits will somehow financially benefit the remaining participants in the fund. In Whisman v. Robbins, 810 F.Supp. 936, 944-45 (S.D.Ohio 1992), the court rejected this contention, stating:
 This same argument was made and rejected by the Eleventh Circuit Court of Appeals in Deak v. Masters, Mates & Pilots Pension Plan, 821 F.2d 572 (11th Cir.1987), cert. denied, 484 U.S. 1005, a case cited by Whisman in support of his contention. The Court is not persuaded by Whisman's attempt to bind the Trustees by a duty not imposed under ERISA. Further, this Court concludes that the Trustees did not breach any duties under ERISA by not producing documentation indicating the financial impact of their decision affecting Whisman. ERISA defines the fiduciary duties of those who administer employee pension plans. Section 404(a)(1) of ERISA, 29 U.S.C. Sec. 1104(a)(1), states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...." All this section imposes on trustees is an affirmative duty to act with care, skill, prudence and diligence in the interest of fund participants and beneficiaries. There is no statutorily imposed duty to consider the financial integrity of a plan before suspending retirement benefits upon a retiree's reemployment.
 (Citations omitted). For the same reasons, we find Gardner's assertion to be without merit.
 
 
 [10]
 The Ninth Circuit has observed:
 Section 203(a)(3)(B)(ii) was enacted for a number of reasons and represents a compromise of conflicting interests. Congress undoubtedly realized that by allowing plans to suspend payment of retirement benefits to members who continue or return to work in the same type of employment, retirees would be discouraged from obtaining such jobs thereby opening the job market for younger plan members. See Riley v. MEBA Pension Trust, [570 F.2d 406, 410 (2d Cir.1977) ]. The section also enables plans "to protect participants against their pension plan being used, in effect, to subsidize low-wage employers who hire plan retirees to compete with, and undercut the wages and working conditions of employees covered by the plan." 120 Cong.Rec. 15737 (remarks of Sen. Williams), reprinted in [1974] U.S. Code Cong. & Ad. News 5181-82. However, in order to achieve these goals without forcing pension-age workers into complete retirement, Congress limited permissible suspensions to those imposed only while the otherwise eligible plan member remained employed in the same industry, same trade, and same geographic area covered by his plan.
 Smith v. CMTA-IAM Pension Trust, 654 F.2d 650, 658 n. 9 (9th Cir.1981).
 
 
 [11]
 Whereas we have been discussing section 4.14, the Whisman court analyzed section 4.12, which was the Reemployment and Suspension of Benefits Rules section in effect prior to the Plan's March 1, 1990, amendment. Because of the similarities in the two versions, this will not affect our analysis
 
 
 [12]
 In support of his contention that the Trustees' decision was arbitrary and capricious, Gardner also asserts that the rules were inconsistently applied, claiming that benefits were paid to at least one other person--William R. Long--under similar circumstances. Further, because the Trustees failed to address this claim in their minutes or in their decision, they necessarily acted arbitrarily and capriciously
 The case of William R. Long has no bearing on Gardner's claim. The Long case involved the settlement of a lawsuit that concerned the interpretation of a nonexistent policy, not the application of prohibited reemployment rules. Moreover, for the reasons we discuss in the body of this opinion, we do not believe that the Trustees' failure to specifically address this argument in its minutes or decision constitutes an abuse of discretion.