**Dennis ARNDT, Plaintiff–Appellant,**

v.

**SECURITY BANK S.S.B. EMPLOYEES' PENSION PLAN and Marshall & Ilsley Corporation, Defendants–Appellees.**

No. 98–3943.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1999.

Decided June 24, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied July 27, 1999.

Robert E. Shumaker (argued), Dewitt, Ross & Stevens, Madison, WI, for Plaintiff–Appellant.

Valerie L. Bailey–Rihn, Quarles & Brady, Madison, WI, for Defendants–Appellees.

Before RIPPLE, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In this case, brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, we must decide whether the benefits at issue are retirement benefits or disability benefits.

Dennis Arndt worked for Security Bank from 1967, when he was 20 years old, until 1990, when as a result of an automobile accident he became permanently disabled at the age of 43. As of December 31, 1992, his employment with Security terminated and, under a written agreement, he was deemed to be a disabled, inactive employee on a permanent leave of absence.

At that time he was a fully vested participant in the Security Bank S.S.B. Employees' Pension Plan. As relevant here,

the plan provided in section 4.4 that, if a participant's employment terminated because of a disability, the participant would receive a pension benefit calculated as if he had continued to work for the bank until either his normal retirement date, which under the plan is age 65, or the termination of his disability:

> If a Participant terminates Employment because of a Disability, he shall receive at his Normal Retirement Date a Normal Retirement Benefit calculated as if the Participant continued to work for the Company at the level of his Compensation upon the commencement of such Disability until the earlier of his Normal Retirement Date or the cessation of his Disability.

On October 1, 1997, Security merged into Marshall & Ilsley Corporation (M & I), which then became the sole trustee of the plan. In connection with the merger, Security amended the plan to freeze the accrual of benefits effective December 31, 1997. Employees of Security Bank who became employees of M & I were then covered by the M & I Retirement Program beginning January 1, 1998. On May 1, 1998, M & I gave notice of its intent to terminate the Security plan effective July 1, 1998.

As a result, M & I informed Arndt that it would calculate his benefits as if he had continued to work until December 31, 1997, rather than either his normal retirement date, which would be November 16, 2011, or the termination of his disability. Calculated up to December 31, 1997, his benefits were $5,620.58 per month for life or a lump sum of $522,778.42. If his benefits were calculated based on imputed years of service to a normal retirement date, he would receive $8,718.30 per month or a lump sum benefit of $858,419.58. Parenthetically, we note that Arndt also received separate pre-retirement disability benefits when he became disabled.

■ Arndt sought a determination from the Plan's Administrative Committee that he is entitled to have his pension benefits calculated as they would have been under the Security plan. The committee found against him. He then filed this lawsuit seeking a determination of benefits and an injunction preventing the defendants from terminating the plan assets without providing for payment of what he saw as his accrued pension benefit. He characterizes the benefit as either an accrued pension benefit or a retirement-type subsidy. M & I (for efficiency's sake we will refer to the appellees collectively as M & I) says that what he is receiving is a disability benefit. The dispute was presented to the district court on defendants' motion to dismiss. The motion was granted on October 13, 1998. We review a decision on a motion to dismiss *de novo*, accepting as true the well-pleaded factual allegations in the complaint and drawing all reasonable inference in Arndt's favor. *Gould v. Artisoft, Inc.*, 1 F.3d 544 (7th Cir.1993).

It is important to note, and undisputed in this case, that M & I is permitted by 29 U.S.C. § 1054(h) to amend the plan to reduce or eliminate benefits and by § 1344(d) to terminate the plan and recover its excess assets. Article 12 of the plan itself sets out the power of the trustees to amend or terminate the Security plan. But, under ERISA, the bank may not reduce accrued retirement benefits, which is what Arndt says it is doing.

■ Certain other principles are undisputed. Section 204(g)(1) of ERISA, 29 U.S.C. § 1054(g)(1), provides, with exceptions not relevant here, that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan...." Under § 1002(23) the definition for "accrued benefit" is "the individual's accrued benefit determined under the plan ... expressed in the form of an annual benefit commencing at normal retirement age." In addition, under § 204(g)(2), 29 U.S.C. § 1054(g)(2), eliminating or reducing an "early retirement benefit" or a "retirement-type subsidy" is to be treated as reducing accrued benefits, which as we

just said is forbidden under subsection (1). On the other hand, it is also undisputed that disability benefits can be changed by plan amendment. *Williams v. Plumbers & Steamfitters Local 60*, 48 F.3d 923 (5th Cir.1995).

What we need to decide is whether under ERISA Arndt's benefits are accrued; are a retirement subsidy; or, on the other hand, whether they are disability benefits. Then we will look to the plan itself to see whether somehow it independently prevents M & I's actions. The issues are simply stated, but not easily resolved.

■ Tackling the easier of the issues first, we find that for a number of reasons the benefits beyond December 1997 are not accrued pursuant to § 204(g)(1). Arndt argues that we should take a broad view of accrued benefits that would include a *right* to have his benefit calculated as if he worked to his normal retirement date. He claims that the right accrued when he became disabled. At that time no further action on his part—such as working year after year—was required for him to have his benefits accrue. To take that right away violates § 204(g)(1), he says. M & I does not dispute that up until December of 1997 the benefits were accrued; they had accrued as each year of disability passed. For that reason, benefits were paid through the date of the plan termination. But, M & I says, the plan simply created a rule for imputing service—that is, imputing to him the years—one by one as they passed—even though he was not working. In this view, his accrued benefit in 1997 was the number of years he had worked prior to disability plus the years that passed between the onset of the disability and 1997—his imputed and actual service.

There is no dispute that Arndt is permanently disabled; there is no chance that he will be able to return to work. In that circumstance, to say that he has done everything necessary to obtain the benefits makes some sense. However, the plan is written to apply to all disabled persons, including those who may eventually return to work. The latter would accrue imputed years of service for the years during which they were disabled, but the imputed service would cease when they become able to return to work. In that circumstance, the plan makes better sense only if each year of imputed service is accrued as it passes. In order to continue the accrual, the person must continue to be disabled.

The situation bears some similarity to the one set out in *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164 (11th Cir.1988). When the Dixie Engine plan terminated, Blessitt had not yet reached normal retirement age. He argued, however, that his retirement benefit should be based on the future years of service he would have performed under the plan up to his retirement age because "this is the retirement benefit he expected to receive when he retired...." The argument was soundly rejected. Arndt's case involves imputed, not actual, years of service, but, without intending to be insensitive to Arndt's plight, we find his case is not significantly different from the rejected claim in *Blessitt*. So long as the plan is in effect and he remains disabled, he would continue to accrue years of service. In Blessitt's case, so long as the plan was in effect and he continued to work for the company, he would accrue years of service. Arndt says that when he became disabled he had an expectation that he would continue to accrue years of service toward retirement; Blessitt said that when he began to work for the company, he expected that he also would continue to accrue years of service toward retirement. The *Blessitt* court found his expectation untenable. ERISA plans do not make such rash promises, nor are they required to.

Arndt would distinguish his situation from Blessitt's: Arndt has done all he could to obtain the benefit—i.e., he had become disabled—and therefore, he argues, the right to his benefit had accrued. But the plan does not say that once a person becomes disabled he will immedi-

ately become vested in his normal retirement benefit. If that were what the plan intended, any discussion of imputed years of service could be eliminated. Once again, such a provision also would not be easy to apply to a disabled person who may recover.

It is important that the plan be applied in a nondiscriminatory way, so as not to provide a benefit to Arndt, who was a highly compensated employee, which might not be equally provided to another employee. M & I has a fiduciary duty toward all plan participants. Specifically, under 26 U.S.C. § 401(a)(4), benefits provided under a tax-qualified retirement plan may not discriminate in favor of highly compensated employees or former highly compensated employees. *See also* 26 U.S.C. § 414(q). Arndt's 1991 compensation was $175,186, which puts him in that class. Arguably, if the plan were to be found to have discriminated in Arndt's favor, it could lose its status as a tax-qualified retirement plan, an event which would be unfortunate for other participants, who could lose their ability to defer taxes on distributions.

For all of these reasons, we find that the plan is best interpreted as providing for imputed years of service on a year-by-year basis. Unless another provision of ERISA applies to them, Arndt's benefits beyond 1997 are not accrued. Section 204(g)(1) does not provide him with the relief he seeks.

■ The other possibility, however, is that Arndt's benefits are, nevertheless, protected if they constitute a "retirement-type subsidy." A retirement-type subsidy is protected by § 204(g)(2), which provides that a plan amendment which has the effect of "eliminating or reducing an early retirement benefit or retirement-type subsidy (as defined in regulations)" is to be "treated as reducing accrued benefits." In addition, in the case of a retirement-type subsidy, the provision applies "only with respect to a participant who satisfies (ei-

ther before or after the amendment) the preamendment conditions for the subsidy."

■ We have determined that what the "either before or after the amendment" language means is that a participant can "grow into" early retirement benefits and presumably retirement-type subsidies as well. We agreed with other circuits that "as long as an employee satisfies, or will be able to satisfy, the eligibility requirements of the early retirement benefit in effect prior to the amendment, § 204(g) protects the benefit." *Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1036 (7th Cir.1996), citing cases from the Third, Fifth, and Eighth Circuits. By living until he is 65, Arndt would grow into the benefits. But that does not answer the underlying question.

It may seem that § 204(g)(2) raises more questions than it answers, the basic one being what exactly is a "retirement-type subsidy." The statute refers to a subsidy "as defined in the regulations." Unfortunately, there is no regulation yet promulgated which defines the term. We are on our own.

One way to approach the question is through Arndt's analogy to the contrast between "early retirement" and "normal retirement" at the age of 65. If, in an effort to encourage employees to retire early, plans provide that employees who retire at 55 with 30 years of service, for instance, shall receive a retirement benefit at age 55, unreduced because they did not wait to collect it until normal retirement age, they would be receiving an "early retirement subsidy." We must point out, however, that although the benefit is not reduced a certain percentage for each year the recipients are under age 65, they also do not receive credit for the additional 10 years of service they would have accrued had they continued to work to age 65. This much is undisputed. But Arndt continues the analogy; he says that a participant who becomes disabled also receives a full normal retirement benefit as if he had worked until normal retirement age, just

as does the person taking early retirement. By analogy, Arndt says, the disabled employee then is also receiving a retirement-type subsidy.

We question the validity of the analogy. For one thing, under the IRS regulations a plan may credit periods of disability as service to be counted in computing a "normal retirement benefit." A plan is allowed to provide for imputed service, defined under the regulations as "any service credited for periods after an employee has commenced participation in a plan while the employee is not performing services," 26 C.F.R. § 1.401(a)(4)–11(d)(3)(ii)(B). A legitimate business reason must exist for imputing service, and disability is one such reason. 26 C.F.R. § 1.401(a)(4)–11(d)(3)(iii) and (iv). Because his imputed years of service are treated like actual years of service, and they have to be accrued year by year, Arndt is not receiving the kind of subsidy set out in the statute. Like everyone else, he is just accruing years of service. Arndt's analogy does not convince us that he is receiving a retirement-type subsidy.

As is obvious by now, Arndt's benefit has some characteristics of a disability payment and some characteristics of a retirement benefit or a retirement-type subsidy. It is like a retirement benefit in that payment begins at normal retirement age, with the payments apparently being merged into the regular pension payment. The imputed years of service are counted toward the pension benefits. The Senate Report of the Finance Committee on the Retirement Equity Act of 1984 states:

> The bill provides that the term "retirement-type subsidy" is to be defined by Treasury regulations. The committee intends that under these regulations, a subsidy that continues after retirement is generally to be considered a retirement-type subsidy. The committee expects, however, that a qualified disability benefit, a medical benefit, a social security supplement, a death benefit (including life insurance) or a plant shutdown benefit (that does not continue after retirement age) will be not considered a retirement-type subsidy. The committee expects that Treasury regulations will prevent the recharacterization of retirement-type benefits as benefits that are not protected by the provisions.

S. Rep. No. 98–575 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576.

But the benefit also has characteristics of a disability payment. As we have previously said, the plan language regarding this benefit applies to all persons with disabilities, including those whose periods of disability may end. The benefit is that during the period of disability the accrual of years of service continues. The years are credited as they pass. Viewed from this angle, the benefit is a disability benefit. The disability is the reason for the benefit.

Section 411(a)(9) of the Internal Revenue Code, 26 U.S.C. § 411(a)(9), sets out the minimum vesting requirements for qualified pension and profit sharing plans. The statute says that a normal retirement benefit is determined without regard to "disability benefits not in excess of the qualified disability benefit." § 411(a)(9). Treasury Decision 8360, 56 Federal Register 47524, 47531 (1991), explains that disability benefits do not affect a plan's status as a qualified plan under § 411:

> Under section 411(a)(9), a qualified disability benefit can be provided up to the maximum normal retirement benefit, and can commence either at the time of disability (without actuarial reduction) or at normal retirement age. *A benefit attributable to the period while an employee is disabled continues to be characterized as a qualified disability benefit* even though an employee returns to work or reaches normal retirement age. Consequently, a plan that provides benefits attributable to the period an employee is disabled does not have to test these benefits under the nondiscriminatory amounts requirement of section 401(a)(4) because these benefits are qualified dis-

ability benefits and thus, are not included in the calculation of an employee's accrued benefit. (Emphasis added.)

Arndt's benefit is one "attributable to the period" he was disabled. The fact that the more common understanding of disability benefits is that they are paid in lieu of wages, rather than after retirement, is not controlling, nor apparently even accurate. The Treasury decision makes clear that sometimes disability payments are not paid until retirement age. Or, as a commentator has put it:

> In some cases, LTD [long-term disability] provides funds for pension accrual in addition to cash benefits. Other plans provide that the pension itself accrues a deferred benefit payable at normal retirement age, while the disabled worker is receiving LTD benefits.

Jeffrey D. Mamorsky, Employee Benefits Handbook ¶ 38.03(2)(c) (1998).

Looking at the benefit from all angles under ERISA, we conclude that it is best characterized as a benefit which Arndt receives because he is disabled. The immediate disability benefit is the service imputed to him while he remains disabled. It is a benefit arising out of a disability. Arndt's pension will be enhanced by the imputed years of service, but the enhancement is a benefit based on a disability.

Nor does the plan itself change our determination. The plan closely tracks ERISA provisions. And it is true that § 1.1 provides, in part, that the "rights of a Participant whose Employment terminates on or after the Restatement Date [July 1, 1989, ironically the date of a prior amendment of the plan] shall be governed by the Plan as in effect for him at the time of such termination of Employment." Arndt seems to argue that § 1.1 prevents alteration of the plan. However, Article 12 allows for amendment and termination of the plan so long as participants' accrued

benefits are nonforfeitable. The plan sets out the benefit at issue in terms we have already described. It is noteworthy, however, that the provision on which Arndt relies is in a part of the plan entitled "Disability," not that the title is dispositive, but considered with other factors the placement reinforces our view that the benefit is a disability benefit. As such, it can be changed by plan amendment, and the motion to dismiss was properly granted. The judgment of the district court is AFFIRMED.