In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-3314

THOMAS E. HEINZ AND RICHARD J. SCHMITT, JR.,

*Plaintiffs-Appellants,*

*v.*

CENTRAL LABORERS' PENSION FUND,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois, Peoria Division.
No. 99-CV-1388—**Joe Billy McDade**, *Chief Judge.*

ARGUED FEBRUARY 12, 2001—DECIDED SEPTEMBER 13, 2002

Before CUDAHY, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* We are asked to decide whether a pension plan amendment which expands the types of post-retirement employment that trigger mandatory suspension of early retirement benefits violates ERISA's "anti-cutback" rule, 29 U.S.C. § 1054(g), when applied to suspend the benefits of the plaintiffs, who retired before the amendment. The district court, relying on *Spacek v. Maritime Ass'n*, 134 F.3d 283 (5th Cir. 1998), granted judgment on the pleadings in favor of the defendant pension fund. We reject the Fifth Circuit's interpretation of 29 U.S.C. § 1054(g) and hold that the amendment,

which had the effect of reducing the plaintiffs' early re-
tirement benefits, violates the anti-cutback rule.[1]

## I. BACKGROUND

The facts are not in dispute. Plaintiffs Thomas E. Heinz
and Richard J. Schmitt, Jr., are participants in a multi-
employer pension plan administered by defendant Central
Laborers' Pension Fund. Both plaintiffs, who were 39
years old when they retired in 1996, qualified for and be-
gan receiving monthly benefits payments under a "service-
only pension," which was available to participants who
retired at any age, so long as they had earned 30 or more
pension credits. The monthly payments available under
the service-only pension were the same as those available
at normal retirement age—that is, the benefits were not
actuarially reduced to take into account that payments
began at an earlier age and would continue over a longer
period. The monthly amount was determined based on
the contribution rates at which the required 30 pension
credits were earned.

Under the plan, monthly benefit payments for those
retiring before age 60, like the plaintiffs, were subject
to suspension for periods during which the participants
worked in certain "disqualifying employment." At the time
of plaintiffs' retirement, disqualifying employment was de-
fined in the plan (for employees retiring before age 60) as
employment:

> in a job classification of any type specified and
> covered in a collective bargaining agreement or

---

[1] Because this opinion conflicts with the Fifth Circuit's decision
in *Spacek*, it has been circulated pursuant to Circuit Rule 40(e) to
all members of the court in regular active service. A majority did
not wish to hear the case en banc. Judge Evans voted to grant re-
hearing en banc.

in any occupation or job classification where contributions are to be made to the Fund pursuant to a written agreement (either as a union or non-union construction worker).

After their retirement, plaintiffs obtained jobs as supervisors in the construction industry, which was not disqualifying under the existing definition. For two years the plaintiffs worked as construction supervisors while collecting monthly pension benefits. Then, in 1998, the plan was amended and the definition of disqualifying employment was expanded to include (for participants who retired before age 53) work "in any capacity in the construction industry (either as a union or non-union construction worker)."[2] The Fund construed this amended definition as covering plaintiffs' supervisory work and suspended their monthly benefit payments.

The plaintiffs sued the Fund and, on cross motions for judgment on the pleadings, the district court entered judgment for the Fund. The district court, after careful analysis, held first, that the anti-cutback rule does not apply to suspensions of early retirement benefits payments triggered by disqualifying employment, and second, that the Fund's interpretation of the amended definition of disqualifying employment to include supervisory work was not arbitrary and capricious. The plaintiffs appeal on both grounds.

---

[2] The amended plan distinguished between early retirement benefits that accrued before and after the amendment. For participants who retire before age 53, the amended definition of disqualifying employment quoted above applied to early retirement benefits that accrued before the amendment; benefits accruing after the amendment were subject to suspension for any kind of post-retirement work. (Amendment No. 7, Section 6.7(b) & (c).)

## II. ANALYSIS

ERISA does not require employers to provide pension or early retirement benefits, or mandate a particular level of benefits. *Hickey v. Chicago Truck Drivers, Helpers and Warehouse Workers Union*, 980 F.2d 465, 468 (7th Cir. 1992). Instead, "ERISA protects the benefits described in the Plan by ensuring that, if a pensioner is promised a benefit and fulfills the conditions required to receive it, the pensioner will actually receive the described and promised benefit." *Id.* at 469. ERISA protects benefits from forfeiture through detailed rules regulating vesting and accrual rates, which ensure the participant's right to receive promised benefits notwithstanding his or her consent to plan provisions that would otherwise require forfeiture. *See* JOHN H. LANGBEIN & BRUCE A. WOLK, PENSION AND EMPLOYEE BENEFIT LAW 121-22 (3d ed. 2000).

One limited exception to the non-forfeiture rules is that pension plans may contain provisions requiring the suspension of monthly benefit payments if a participant works in certain jobs after retirement. *See* 29 U.S.C. § 1053(a)(3)(B)(ii); ERISA § 203(a)(3)(B). Under this exception, multiemployer plans may provide for suspension of benefit payments if the retiree works "in the same trade or craft, and the same geographic area covered by the plan." *Id.* For early retirement benefits, plans may contain even broader limitations on re-employment, according to a Department of Labor regulation promulgated under ERISA § 203(a)(3)(B). *See* 29 C.F.R. § 2530.203-3(a). The plaintiffs do not contend that the restrictions on post-retirement employment contained in the plan, either before or after the 1998 amendment, violate these restrictions. Instead, they assert that the amendment, which expanded the scope of disqualifying employment, violated the anti-cutback rule of § 1054(g). We review de novo the district court's decision to grant judgment

on the pleadings in favor of the Fund. *See Velasco v. Ill. Dept. of Human Servs.*, 246 F.3d 1010, 1016 (7th Cir. 2001).

A.  Plan Amendments Under 29 U.S.C. § 1054(g)

   Plan amendments are permitted under ERISA, *see* 29 U.S.C. § 1102(b)(3), but an amendment may not decrease benefits that have already accrued. *See* LANGBEIN & WOLK, *supra* at 160. According to paragraph (1) of the anti-cutback rule:

> The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.

29 U.S.C. § 1054(g)(1); ERISA § 204(g)(1).[3] "Accrued benefit" is defined under ERISA as "the individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23). This definition has been interpreted to include retirement benefits and to exclude "ancillary benefits not directly related to retirement benefits" like insurance or disability benefits, *see* 26 C.F.R. 1.411(a)-7; *Hickey*, 980 F.2d at 468, and some courts, relying on this definition, have held that early retirement benefits were likewise excluded. *See Meridith v. Allsteel, Inc.*, 11 F.3d 1354, 1359-60 (7th Cir. 1993), *overruled by Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1036 (7th Cir. 1996); *Bencivenga v. Western Penn. Teamsters and Employees Pension Fund*, 763 F.2d 574, 577-78 (3d Cir. 1985).

---

[3] The two stated exceptions relate to cases of "substantial business hardship" (29 U.S.C. § 1082(c)(8)) and terminated multi-employer plans (29 U.S.C. § 1441). The Fund does not assert that either exception applies.

Paragraph (2) of § 1054(g), added by the Retirement Equity Act of 1984, P.L. 98-397, makes clear, however, that early retirement benefits are within the protection of the anti-cutback rule. Under that new provision, the test is not whether the amendment decreases "accrued benefits," but rather whether the amendment "has the effect of—eliminating or reducing" early retirement benefits attributable to service before the amendment:

> For purposes of paragraph (1), a plan amendment which has the effect of—
>
>> (A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
>>
>> (B) eliminating an optional form of benefit,
>
> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. . . .

29 U.S.C. § 1054(g)(2); ERISA § 204(g)(2); *see Ahng*, 96 F.3d at 1036; *Arndt v. Security Bank S.S.B. Employees' Pension Plan*, 182 F.3d 538, 540-41 (7th Cir. 1999).[4] There is no question that the benefits at issue here are "attributable to service before the amendment" because the plaintiffs had already retired when the plan was amended. The only question, then, is whether the 1998 plan amendment "has the effect of—eliminating or reducing" the plaintiffs' early retirement benefit.

---

[4] For simplicity, we will refer to the plaintiffs' benefit as an early retirement benefit, without intending any substantive distinction between that term and "retirement-type subsidies." (On the difference between the terms, see *Arndt*, 182 F.3d at 542; DAN M. MCGILL & DONALD S. GRUBBS, JR., FUNDAMENTALS OF PRIVATE PENSIONS, at 131-35 (Pension Research Council) (6th ed. 1989), *reprinted in* LANGBEIN & WOLK, *supra*, at 447-48.)

Before the amendment, plaintiffs had the right under the plan to work as construction supervisors and continue to receive their monthly benefit payments. When disqualifying employment was redefined to include work "in *any capacity* in the construction industry (either as a union or non-union construction worker)," and when the Fund applied that definition to supervisory work, the plaintiffs lost their right to work as construction supervisors while collecting benefits.

We conclude that plaintiffs' loss of the option of working as construction supervisors was a reduction of their early retirement benefits within the meaning of § 1054(g)(2). A participant's benefits cannot be understood without reference to the conditions imposed on receiving those benefits, and an amendment placing materially greater restrictions on the receipt of the benefit "reduces" the benefit just as surely as a decrease in the size of the monthly benefit payment. We have not before interpreted the prohibition in the anti-cutback rule as limited to amendments that reduce the amount of the periodic payment, and we find nothing in the language of the rule that suggests such an interpretation. In *Ahng*, for example, we held that the plaintiffs had stated a claim for violation of § 1054(g) when they alleged that a plan amendment changed the deadline by which the employee must retire in order to receive supplemental early retirement benefits. 96 F.3d at 1036-37; *see also Bellas v. CBS, Inc.*, 221 F.3d 517 (3d Cir. 2000) (plan amendment that changed eligibility requirements for early retirement benefits violated § 1054(g)). Similarly, in *Michael v. Riverside Cement Co. Pension Plan*, 266 F.3d 1023, 1027-28 (9th Cir. 2001), the Ninth Circuit held that an amendment that eliminated the plan's "no-offset rule," which had allowed a participant to receive full early retirement benefits without regard to the amount he already received upon previous retirement, violated § 1054(g) even though the amendment increased the plaintiff's

monthly benefit payment. *Cf. Hickey*, 980 F.2d at 468 (7th Cir. 1992) (plan amendment that eliminated the participant's right to cost-of-living adjustments violated the anticutback rule).

The Fund argues that these cases are distinguishable because a change in the eligibility requirements, as in *Ahng* for example, differs from a change in the conditions triggering suspension of benefit payments in that the former permanently reduces benefits or eliminates certain participants' rights to benefits, whereas a suspension is temporary. We find the distinction unconvincing. Although with a suspension the interruption in benefit payments is temporary, the retiree never recovers the payments lost during the employment period. The amendment thus "eliminates" monthly benefit payments for participants who take certain jobs after retirement and "reduces" the participant's total early retirement benefits by an amount determined by how long the disqualifying work continues. Plaintiffs lost a valuable right they had earned before the amendment—the right to continue to work in the industry while receiving monthly benefit payments—and that loss was permanent.[5] In our judg-

---

[5] We respectfully believe that our dissenting colleague, by describing post-retirement income as a "bonus," mischaracterizes and underestimates the value of this right to plan participants, who were entitled to count on that pay to supplement their pension. There are other sources of such income, but compensating for lost income is more difficult the closer one is to retirement (or as here, early retirement). Amendments that restrict post-retirement employment most harshly affect those nearing retirement and especially those who have already retired, who have foregone other income-producing options which require long-term planning (such as taking re-training classes or fortifying savings and investment accounts). In this way, the amendment's effect in this case is like any reduction of benefits attributable to ser-

(continued...)

ment, this was a reduction of early retirement benefits within the plain meaning of § 1054(g)(2).[6]

---

[5] (...continued)
vice already performed—it disproportionately affects those with greater service.

[6] The Fund also asserts that the amendment was necessary to curb the practice of "double-dipping," which it claims was depleting fund assets. We note that the pre-amended plan already provided for suspension of benefits if the retiree resumed work in jobs for which contributions were made to the Fund, so it does not appear that the amendment was aimed at "double-dipping" in the sense of preventing a participant from accruing additional benefits while drawing a pension. In any event, the anti-cutback rule does not prohibit the Fund from curbing certain reemployment prospectively, that is, by using the new definition of disqualifying employment to suspend the portion of the benefit payment attributable to service after the amendment. *Cf.* H.R. Rep. No. 98-655, Pt. 2 at 26-27 (1984); S. Rep. No. 98-575, at 29, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2575. But there is no question that at the time of plaintiffs' retirement, the plan permitted the very practice that the Fund now disparages—working as construction supervisors while receiving benefits. We can see no basis for inferring that Congress intended to exclude from the anti-cutback rule amendments based on claims of financial circumstances that fall short of the two exceptions identified in § 1054(g)—for cases of substantial business hardship and for terminated plans. *See Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.*, 788 F.2d 428, 433 (7th Cir. 1986) (" 'the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded.' ") (quoting *In re Cash Currency Exchange*, 762 F.2d 542, 552 (7th Cir. 1985)). The anti-cutback rule, by protecting benefits attributable to service already performed, assures that the relatively greater effect on retirees of any change is adequately weighed when determining how to deal with financial contingencies.

B.  *Spacek v. Maritime Association*

The Fund points out, however, that "suspensions" are not identified along with the prohibitions against decreases, reductions, and elimination of benefits in the the anti-cutback rule. The Fund relies on *Spacek v. Maritime Ass'n*, 134 F.3d 283 (5th Cir. 1998), in which the Fifth Circuit concluded that an amendment like the one in this case did not violate the anti-cutback rule because it concerned a "suspension" and not a "reduction" in benefits.[7] The Fifth Circuit supported its conclusion with: (1) an examination of the use of the two terms under the statute and related regulations; (2) the legislative history of the Retirement Equity Act; and (3) a Treasury regulation concerning the effect of suspensions on "accrued benefits." We respectfully conclude, however, that the Fifth Circuit's arguments do not support its conclusion.

1.  Suspensions and reductions under ERISA.

In *Spacek*, the court noted that "[t]hroughout the statute and corresponding regulations, the concepts of reduction of benefits and suspension of benefit payments are used in distinct ways, often within a single provision." 134 F.3d at 288-89 (citing 29 U.S.C. §§ 1441(a), 1341a(d) & 1342(d)(1)(A)(v); 29 C.F.R. § 2520.104b-4(a)(1)(iii)). From

---

[7]  The Sixth Circuit, in *Whisman v. Robbins*, 55 F.3d 1140, 1147 (6th Cir. 1995), also stated that § 1054(g) did not apply to an amendment allegedly expanding restrictions on post-retirement employment because a "suspension" was not a "reduction or elimination" of benefits. This statement, however, was dicta, because the court held that the plaintiff would have lost even under the pre-amendment version of the plan. *Id.* Moreover, the court did not support its conclusion with any analysis, so the opinion is not helpful to our task.

this the court reasoned that to interpret the prohibition in the anti-cutback rule against amendments that reduce benefits as applying to suspensions would "make the word 'suspension' redundant in all of these statutory provisions and interpretive regulations." *Spacek*, 134 F.3d at 289. This redundancy, according to *Spacek*, would violate the canon of statutory construction that every word in a statute must be given meaning. *Id.*

We disagree with the inference that *Spacek* draws from the various provisions that refer to both reductions and suspensions. Our interpretation of the anti-cutback rule does not suggest that *all* suspensions are "reductions" (or vice versa), only that *if* the suspension is pursuant to an amendment that reduces benefits (attributable to service before the amendment), then it is a reduction within the anti-cutback rule. This interpretation does not render the word "suspension" in the other provisions redundant.

For example, *Spacek* relies on various provisions in Title IV of ERISA (relating to financially troubled and terminated plans) that refer to both "reduction of benefits" and "suspension of benefit payments"; according to *Spacek*, to avoid redundancy, the former phrase must be construed as excluding the latter. *Id.* But *Spacek*'s identification of the two relevant phrases is too narrow; to the extent the Title IV provisions identify two separate categories, they are *amendments that reduce benefits* on the one hand, and *suspension of benefit payments*, on the other. Section 1441, governing plan terminations, is typical:

(a) Amendment of plan by plan sponsor to reduce benefits, and suspension of benefit payments

Notwithstanding sections 1053 and 1054 of this title, the plan sponsor of a terminated multiemployer plan to which section 1341a(d) of this title applies shall *amend the plan to reduce benefits*, and

shall *suspend benefit payments*, as required by this section.

29 U.S.C. § 1441(a) (emphasis added)[8]; *see also* 29 U.S.C. § 1425(a)(1) & 26 U.S.C. § 418D(a)(1) (plans in reorganization may amend the plan to reduce benefits); 29 U.S.C. § 1426(a) & 26 U.S.C. § 418E(a) (insolvent plans may suspend benefit payments); 29 U.S.C. § 1053 (a)(3)(E)(ii) & 26 U.S.C. § 411(a)(3)(F) (exception to forfeiture rule for amendments that reduce benefits under §§ 1441 or 1425, and suspension of benefit payments under §§ 1441 and 1426). Because the latter category (*suspension of benefit payments*) includes suspensions *not* according to any amendment, as in the case of insolvent plans, for example, it is not rendered superfluous by interpreting the amendment in this case as falling into the former category (*amendments that reduce benefits*).[9]

In other words, even crediting the reliability of any inference about the anti-cutback rule that can be drawn from the use of these phrases in various provisions relating to terminated or troubled plans, the most we can infer is that a suspension of benefit payments not falling

---

[8] The reference to reduction and suspension in § 1341a, also relied upon by the court in *Spacek*, *see* 134 F.3d at 289, is derivative of section 1441, directing plan sponsors to "reduce benefits and suspend benefit payments in accordance with section 1441 of this title." 29 U.S.C. § 1341a(d).

[9] The reference to reduction and suspension in 29 U.S.C. § 1301(a)(8), which defines "non-forfeitable benefit" in the context of termination insurance, is consistent with this analysis. It states that the definition applies "whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or the Internal Revenue Code of 1986." A suspension of benefits in the case of an insolvent plan would be a suspension "by operation of this chapter" and not a reduction "by plan amendment."

into the first category—amendments that reduce benefits—should be excluded from the anti-cutback rule. But other than in the case of insolvent or terminated plans, an administrator's authority to suspend benefits must come from the plan. And as we noted before, no one is disputing that the suspension in this case would be proper if it were contained in the original plan. It is the propriety of the *amendment* to the plan that is at issue in this case, and not the suspension itself, and therefore we cannot infer from the distinction made in Title IV between suspensions of benefit payments and amendments that reduce benefits that the amendment in this case is beyond the anti-cutback rule.[10]

---

[10] The Fifth Circuit also relies on a Department of Labor regulation, 29 C.F.R. § 2520.104b-4(a)(1)(iii), which requires notice of plan provisions "under which the present benefit payment may be reduced, changed, terminated, forfeited or suspended." Under the Fifth Circuit's reasoning, this list of overlapping terms creates a whole host of redundancy problems unless we construe the list as creating mutually exclusive categories. But there is no need to do so to avoid redundancy because the term "suspended" has application outside the scope of the broader terms. For example, a suspension of benefits could be a forfeiture, but not always—as when the suspension is according to provisions in the plan meeting the requirements for post-retirement employment in § 29 U.S.C. 1053(a)(3)(B). Because a suspension will not always be a forfeiture, identification of the two concepts separately is not redundant, and there is no need to interpret the concept of forfeiture as excluding suspensions. The same is true for suspensions and reductions: a suspension will not always be a reduction in benefits, as when, for example, the suspension is according to the plan as originally conceived. The reference to suspensions in the notice regulation is therefore not rendered redundant by interpreting the amendment in this case as reducing benefits. (For the same reason, there is no redundancy in identifying suspensions and reductions separately

(continued...)

We do not view the omission of a specific reference to suspensions in the anti-cutback rule as an oversight, but as unnecessary. Adding a reference to suspensions in § 1054(g)(1) (*e.g.*, "The accrued benefit of a participant under a plan may not be decreased [*or suspended*] by an amendment of the plan") or § 1054(g)(2) (*e.g.*, "a plan amendment which has the effect of . . . eliminating[,] reducing[, or *suspending*] an early retirement benefit . . ."), would be awkward and perhaps overbroad; it is not the *suspension* of benefit payments that offends the anti-cutback rule, but the change (to the detriment of the participant) in the conditions triggering the suspension, and this concept is adequately captured by the prohibition against amendments that reduce benefits.

2.   Legislative history of the Retirement Equity Act.

The Fund, again relying on *Spacek*, also points to the legislative history of the Retirement Equity Act of 1984, which added paragraph (2)—the provision concerning amendments that reduce or eliminate early retirement benefits—to § 1054(g). *See Spacek*, 134 F.3d at 289-90. *Spacek* found instructive the following comment made by Representative William Clay during the final House debates on the Retirement Equity Act:

> Nor do those provisions in any way apply to or affect the provisions of ERISA section 203(a)(3)(B) and code section 411(a)(3)(B) relating to the suspension of benefits for postretirement employment, including the authorization for multiemployer plans

---

[10] (...continued)
in 29 U.S.C. § 1342 (trustee of terminated plan may "reduce benefits or suspend benefit payments under the plan, give appropriate notices, amend the plan . . .").)

to adopt stricter rules for the suspension of subsi-
dized early retirement benefits.

*Spacek*, 134 F.3d at 289 (quoting 130 Cong. Rec. 23,487
(1984)). The Fifth Circuit concluded that Representative
Clay's remark means that the anti-cutback rule in § 1054(g)
does not limit the power of the plan to amend the plan
to expand the restrictions on post-retirement employ-
ment. *See Spacek*, 134 F.3d at 289-90.

We find Representative Clay's remark ambiguous at
best on the question of whether amendments concerning
suspensions for disqualifying employment are outside
the coverage of § 1054(g).[11] But even if Representative
Clay's understanding of the anti-cutback rule were consis-
tent with the Fifth Circuit's—that suspensions upon dis-
qualifying re-employment represent an additional excep-
tion to § 1054(g)—we find nothing in the legislative history
to indicate that anyone else in Congress shared the un-
derstanding attributed to Representative Clay by the
Fifth Circuit. The parties have not identified, and we
have been unable to find, any further reference in the

---

[11] It is not self-evident that Representative Clay's reference to
"stricter rules" means rules that are "more strict than before the
plan amendment." It could also mean that the new provision was
not intended to affect the existing authorization for multiemployer
plans to impose rules relating to suspensions of early retirement
benefits that are stricter than those authorized for benefits
commencing at normal retirement age, which must conform to
the limits in § 203(a)(3)(B). *See* 29 C.F.R. § 2530.203-3(a)). Sim-
ilarly, Representative Clay's comment that the new provision will
not affect the ERISA provisions that impose limits on the con-
ditions a plan may place on post-retirement employment could
mean simply that the new provision does not address those
conditions substantively; it does not necessarily mean he believed
that an amendment changing those conditions was outside the
anti-cutback rule.

legislative history of the Retirement Equity Act to the exception for suspensions that the Fifth Circuit infers from Representative Clay's remarks.[12] The absence of any additional support in the legislative history suggests to us that the Fifth Circuit gave undue weight to the statement of Representative Clay, which (as interpreted by the Fifth Circuit) is at odds with the straightforward language of the statute. *See Barnhart v. Sigmon Coal Co.*, 122 S. Ct. 941, 953-54 (2002) (rejecting interpretation contained in the floor statements of the statute's sponsors); *Monterey Coal Co. v. Federal Mine Safety and Health Review Comm'n,* 743 F.2d 589, 596 (7th Cir. 1984) (same); *Alex v. City of Chicago*, 29 F.3d 1235, 1239 n.3 (7th Cir. 1994) ("[I]solated remarks of individual legislators, . . . [can]not be used to find ambiguity, or contrary intent, in statutory language that, with respect to a case in hand, is clear on its own terms without rendering nugatory the 'plain meaning' canon of construction.").[13] Accordingly, we conclude that Representative Clay's remarks cannot be used to support an exception to the anti-cutback rule for amendments that expand disqualifying employment.

### 3.   Treasury Regulation 26 C.F.R. § 1.411(c)-1(f).

The court in *Spacek* also found support in 26 C.F.R. § 1.411(c)-1(f), a Treasury Department regulation concern-

---

[12] By contrast, both the House and the Senate Reports discuss the two exclusions specifically identified in § 1054(g)—for cases of substantial business hardship and for terminated multi-employer plans. *See* H.R. Rep. No. 98-655, pt. 2, at 27 (1984); S. Rep. No. 98-575, at 30, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2576.

[13] Moreover, Representative Clay's statement, on August 9, 1984, was made three days after the Senate had passed the bill, on August 6, 1984, see P.L. 98-397, further undermining its reliability as evidence of Congress's intent. *See Sigmon Coal Co.*, 122 S. Ct. at 954 n.15; *Monterey Coal Co.,* 743 F.2d at 597.

ing the allocation of accrued benefits between employer and employee contributions. By way of background, the court first noted that the term "accrued benefit" means the employees' benefit as accrued under the plan, expressed in the form of "an annual benefit commencing at normal retirement age," 29 U.S.C. § 1002(23),[14] or, for early retirement benefits, the actuarial equivalent of the benefit commencing at normal retirement age. *See Spacek*, 134 F.3d at 290 (citing 29 U.S.C. § 1054(c)(3); 26 C.F.R. § 1.411(c)-1(e)).[15] The Treasury regulation relied upon by *Spacek*, 26 C.F.R. § 1.411(c)-1(f)(1), states that in calculating the actuarial equivalent of an accrued benefit, "[n]o adjustment . . . is required on account of any suspension of benefits" if the suspension is permitted under ERISA § 203(a)(3)(B)—the section dealing with restrictions on post-retirement employment.[16] According to the Fifth Circuit, "because the reduction in total benefits paid over the lifetime of the plan participant as a result of the

---

[14]    The term "accrued benefit" means[,] in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age . . . .

29 U.S.C. § 1002(23).

[15]    [I]f an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit . . . .

29 U.S.C. § 1054(c)(3).

[16]    No adjustment to an accrued benefit is required on account of any suspension of benefits if such suspension is permitted under section 203(a)(3)(B) . . . .

26 C.F.R. § 1.411(c)-1(f)(1).

suspension need not be accounted for actuarially in computing the participant's accrued benefit," an amendment "authorizing such a suspension does not serve to decrease the participant's accrued benefits, and thus cannot violate § 1054(g)." 134 F.3d at 291.

This reasoning, however, is inconsistent with the language of paragraph (2) of § 1054(g), which provides that an amendment that has the effect of eliminating or reducing early retirement benefits shall, for purposes of § 1054(g), "be *treated* as reducing accrued benefits." 29 U.S.C. § 1054(g)(2), ERISA § 204(g)(2) (emphasis added); *see Ahng*, 96 F.3d at 1036; *Bellas*, 221 F.3d at 523. Whether a benefit is "accrued" for other purposes under ERISA is irrelevant for purposes of § 1054(g)(2). *See Costantino v. TRW, Inc.*, 13 F.3d 969, 979-80 (6th Cir. 1994) ("There is no inconsistency between Defendant's claim that the definition of 'accrued benefits' excludes [retirement-type] subsidies, and the [Retirement Equity Act's] strategy of protecting subsidies by treating them as 'accrued benefits' in several provisions."); *Bellas*, 221 F.3d at 523 ("While the definition of an accrued benefit has not been modified, Congress did modify section 204(g) in 1984 to the end that early retirement benefits and retirement-type subsidies were defined as being accrued for purposes of ERISA's anti-cutback provisions."). In fact, it was on this basis that we overruled our earlier decision in *Meridith v. Allsteel, Inc.*, 11 F.3d 1354, 1359-60 (7th Cir. 1993), which held that an amendment reducing early retirement benefits did not violate § 1054(g) because the benefits were not accrued benefits as defined under 29 U.S.C. § 1002(23). *See Ahng*, 96 F.3d at 1036-37. The portion of the regulation relied upon by the court in *Spacek*, like the general definition of accrued benefits relied on in *Meridith*, is simply irrelevant to our determination of the scope of § 1054(g)(2), which treats amendments that reduce early retirement benefits as reducing accrued benefits.

The Fifth Circuit reasoned, however, that because the amendment would not decrease "accrued benefits," then the amendment could not violate the anti-cutback rule as applied to full retirement benefits, because for those benefits, the prohibition is limited to amendments that decrease "accrued benefits." *See* 134 F.3d at 291. According to *Spacek*, applying the anti-cutback rule to amendments governing suspension of early retirement benefits would therefore give early retirement benefits greater protection than full retirement benefits, which is contrary to Congress's intent that early retirement benefits receive the same protection as full retirement benefits. *Id.* But *Spacek's* observation about Congress's intent cuts both ways. The question is, same as what? Other than perhaps the remarks of Representative Clay (reliance on which, as we just discussed, is problematic), there is nothing in the legislative history of the Retirement Equity Act to suggest that Congress had any specific understanding about whether amendments affecting suspensions of full or early retirement benefits would be covered. And we disagree with *Spacek's* key premise—that for full retirement benefits, 26 C.F.R. § 1.411(c)-1(f) means that an amendment expanding the conditions triggering a suspension would not be covered by the anti-cutback rule.

As *Spacek* points out, the regulation instructs that in calculating the accrued benefit, no actuarial adjustment need be made to account for the decrease in total benefits paid as a result of the suspension. *See* 134 F.3d at 290. This is consistent with ERISA § 203(a)(3)(B), 29 U.S.C. § 1053(a)(3)(B), which states that a suspension for certain post-retirement employment is not a forfeiture. But it does not necessarily follow that, because no actuarial adjustment is required, an amendment concerning suspensions cannot decrease accrued benefits. To say that a *suspension* is not a forfeiture (or does not decrease

accrued benefits) is not the same as saying that a *change* in the rules governing suspensions cannot decrease accrued benefits. In other words, we can conclude from the regulation that a pre-existing plan provision suspending benefit payments would not decrease accrued benefits; the regulation says nothing, however, about a *change* in the rules regarding suspensions. And if we view "accrued benefits" as including the conditions on receiving those benefits, then the *amendment*, by increasing those conditions, decreases accrued benefits. *Spacek's* logic therefore depends on interpreting the term "accrued benefits" as including only the periodic payment, but excluding the conditions affecting the participant's ability to receive that amount. There is nothing in the statutory definition that compels this interpretation, and we are persuaded that our interpretation is closer to ERISA's purpose of protecting anticipated benefits. *See generally Hickey*, 980 F.2d at 468 ("ERISA protects the benefits described in the Plan by ensuring that, if a pensioner is promised a benefit and fulfills the conditions required to receive it, the pensioner will actually receive the described and promised benefit."); LANGBEIN & WOLK, *supra*, at 121-22.

Another regulation, moreover, supports our conclusion that *Spacek's* construction is too narrow. That regulation, 26 C.F.R. § 1.411(d)-4, which contains the Treasury Department's interpretation of 26 U.S.C. § 411(d)(6) (the counterpart of the anti-cutback rule in the Internal Revenue Code), interprets the anti-cutback rule as applying to amendments that impose further restrictions or increase the conditions affecting benefits that have already accrued. The regulation begins by defining "section 411(d)(6) protected benefits" as including any benefit that is described in 26 U.S.C. §§ 411(d)(6)(A) & (B) (the counterpart in the Internal Revenue Code of the anti-cutback rule in 29 U.S.C. § 1054(g)). 26 C.F.R. § 1-411(d)-4 Q&A-1. It then provides that:

> The addition of employer discretion or objective conditions with respect to a section 411(d)(6) protected benefit that has already accrued violates section 411(d)(6). Also, the addition of conditions (whether or not objective) or any change to existing conditions with respect to section 411(d)(6) protected benefits that results in any further restriction violates section 411(d)(6).

26 C.F.R. 1.411(d)-4 Q&A-7.

The section of the anti-cutback rule dealing with early retirement benefits does not limit the prohibition to a decrease in "accrued benefits," but rather says that an amendment that "has the effect of—eliminating or reducing" benefits will "be treated as reducing accrued benefits." 29 U.S.C. § 1054(g)(2). Reading this language to include an amendment increasing conditions is straightforward, and we decline to abandon this plain reading in favor of the Fifth Circuit's interpretation of the term "accrued benefits," which is neither compelled by the statutory definition nor supported by legislative history or other persuasive authority.[17]

---

[17] One final point: in conducting our research we encountered a sentence in the current Internal Revenue Manual addressing the question posed in this case. The manual states that "[a]n amendment that reduces I.R.C. 411(d)(6) protected benefits on account of 203(a)(3)(B) service does not violate I.R.C. 411(d)(6)." Internal Revenue Manual 4.72.14.3.5.3(7) (available on WEST-LAW RIA-IRM database). This statement does not settle the matter, however. An agency manual is generally entitled only to whatever deference is due based on its persuasiveness. *United States v. Mead Corp.*, 533 U.S. 218 (2001); *Matz v. Household Int'l Tax Reduction Inv. Plan*, 265 F.3d 572, 575 (7th Cir. 2001). The single statement in the manual does not tell us anything about the thoroughness of the agency's analysis or the validity

(continued...)

## III. CONCLUSION

Nothing in ERISA, the legislative history of the Retirement Equity Act, or the Treasury regulation relied upon by the court in *Spacek* persuades us to depart from our conclusion that 29 U.S.C. § 1054(g) unambiguously applies to the amendment in this case, which reduced plaintiffs' early retirement benefits by expanding the conditions triggering a suspension of benefit payments. Because our interpretation of § 1054(g) resolves this appeal, we need not reach the plaintiffs' alternative argument that the Fund trustees' interpretation of the amendment's definition of disqualifying employment to include supervisory work was arbitrary and capricious. The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings.

---

[17] (...continued)

of its reasoning, and we have no basis to conclude that it represents a long-standing agency interpretation. *Compare Barnhart v. Walton*, 122 S. Ct. 1265, 1270 (2002). Furthermore, the manual, although it supports the outcome in *Spacek*, does not support its logic. *Spacek* reasoned that amendments affecting suspensions cannot violate the anti-cutback rule because they cannot reduce accrued benefits. 134 F.3d at 291. The premise of the statement in the manual, however, is that such an amendment "reduces I.R.C. 411(d)(6) protected benefits." To characterize an amendment as "reducing I.R.C. 411(d)(6) protected benefits" is to admit that the amendment is within the anti-cutback rule of I.R.C. § 411(d)(6) (and its counterpart in 29 U.S.C. § 1054(g)). The manual's conclusion that such an amendment does not violate the anti-cutback rule is at odds with the plain language of the statute, even as interpreted by *Spacek,* and without any explanation of its rationale, must be rejected as unpersuasive.

CUDAHY, *Circuit Judge*, dissenting. Judge Williams for the majority has labored with great skill and ingenuity to overcome the efforts of Chief Judge Caroline Dineen King for a Fifth Circuit panel that came out the other way. *See Spacek v. Maritime Ass'n*, 134 F.3d 283 (5th Cir. 1998). Though Judge Williams has put as persuasive a face as may be possible on the majority's position, I still find *Spacek* quite compelling. *Spacek*, it seems to me, presents straightforward and plausible arguments, not susceptible to rebuttal by the sometimes tortured contentions of the majority.

The first pillar supporting the outcome in *Spacek* is the absence of the word "suspend" or its variants from 29 U.S.C. § 1054(g), the anti-cutback rule.[1] Yet "suspend" or its variants appear side-by-side with "reduce" or its variants in numerous other sections of ERISA. If, as the majority argues, the concept of reduction includes suspension, then the use of "suspend" or its variants, in addition to "reduce" or its variants, in many other ERISA sections is redundant. There is no doubt that the drafters knew how to include the concept of suspension, in contrast to that of reduction, when they wanted to do so. I find this plain meaning argument to be quite convincing.

The majority attempts to rebut this argument with two points. First, it seems to say that a "suspension" is

---

[1] Section 1054(g)(2) also prohibits the *elimination* of benefits but the majority, and the parties on appeal, mainly deal with the prohibition against the *reduction* of benefits. Thus, I restrict my analysis to whether a suspension is a reduction of benefits. In any event, there is no elimination of benefits in this case. While it is true that a plan participant will not receive pension payments when he or she is engaged in disqualifying work, the entitlement to pension payments is only temporarily lost and not eliminated. The participant will receive pension payments again when the disqualifying work is finished.

really a "reduction" because over time a "suspension" of the receipt of a benefit reduces the economic value of the total benefits received. Slip op. at 8. Of course, there is an economic loss from a suspension; if there were none, there would be no lawsuit. But, that does not mean that, as used in ERISA, a "suspension" is exactly equivalent to a "reduction" or is included within it. From the point of view of the recipient on the facts before us, the suspension of pension payments does not reduce the recipient's current income because the temporarily lost pension income is replaced by earned income derived, as was the pension, from the very same construction industry. This elimination of "double-dipping" from the construction industry's pockets seems substantially more equitable, and is certainly less burdensome to the pension recipient, than would be a reduction in the amount of the benefit unsupplemented by earned income. Hence, the broadening of the ban on "double-dipping" seems not inequitable.

Second, the majority attempts to dismiss the argument from redundancy based on the numerous ERISA provisions that contain both the words "reduction" and "suspension" by distinguishing those provisions as involving matters other than an amendment purporting to diminish benefits. Slip op. at 11. Thus, the majority apparently concludes that if a suspension is pursuant to an amendment that diminishes benefits, then the suspension *is* a reduction of benefits. Slip op. at 11. On the other hand, if a suspension is not pursuant to such an amendment, then, the majority concludes, it *is not* a reduction of benefits. *Id.* I do not follow this logic. While there may be more than one means of invoking a suspension, what constitutes a suspension—the meaning or definition of a suspension—should not change because the suspension was achieved by one method instead of by another method.

The majority's subsequent argument that § 1054(g) concerns only amendments and thus it only bars suspensions pursuant to an amendment, Slip op. at 14, only makes sense if a suspension is a reduction of benefits. But, beside the majority's ipse dixit, there is nothing to indicate that a suspension of benefits is a reduction of benefits as those terms are used in ERISA. Rather, as the analysis of Treasury Regulation 26 C.F.R. § 1.411(c)-1(f), discussed *infra*, concludes, a suspension is not a reduction of benefits based on ERISA's mode of calculating accrued benefits.

The legislative history involving the clear comments of Representative Clay firmly supports the interpretation based on plain meaning. The effort of the majority to explain away this comment is unconvincing. The comment appears to reflect an understanding at the time of the adoption of the anti-cutback rule that it not apply to adjustments made by the plan (perhaps in the interest of the plan's financial integrity) to the rules involving suspension of benefits in the event of re-employment in the construction industry. With respect to the arguments of the majority depreciating the use of legislative history in general, these arguments become less weighty in the case of legislative history that fits so closely with the interpretation founded on plain meaning.

The plain meaning is also supported by the Internal Revenue Manual described by the majority in its footnote 17. Again, this bit of authority fits neatly into the interpretation derived from plain meaning. It is, therefore, hard to explain away.

That *Spacek*'s interpretation reflects the plain meaning of the statute is supported by the outcome in *Whisman v. Robbins*, 55 F.3d 1140 (6th Cir. 1995). In *Whisman*, the appellant had qualified for a "'30-and-Out' pension benefit, which [was] available to participants with thirty years of

service, regardless of age." *Id.* at 1143. He received $1,000 per month under the "30-and-Out" provision until he began working for the United States Postal Service in 1986, at which time, his pension benefit was suspended under the Plan's re-employment provision. *Id.* The Sixth Circuit held that the re-employment provision, which suspends early retirement benefits if the participant is engaged in prohibited employment, was not contrary to the law. *Id.* at 1146-47 (citing *Gardner v. Central States, Southeast & Southwest Areas Pension Fund*, No. 93-3070, 1993 WL 533540 (6th Cir. Dec. 21, 1993) (per curiam)). The court then dealt with Whisman's argument invoking the anticutback rule of ERISA.

> Whisman counters that *Gardner* is inapplicable because at the time Whisman applied and qualified for pension benefits, [the reemployment provision], adopted in 1987, was not in effect. According to Whisman, the application of the amended reemployment provision violates the principle of *Constantino v. TRW, Inc.*, 13 F.3d 969 (6th Cir. 1994). We disagree. In *Constantino*, this Court held that a plan's attempt to eliminate early retirement subsidies for retirees that had already qualified for the subsidy prior to plan amendment violates the anticutback rules of ERISA and the Tax Code. *Constantino* is based upon an application and enforcement of section 204(g) of ERISA, 29 U.S.C. § 1054(g), which prohibits employers from amending their pension plan to decrease or eliminate early retirement benefits or retirement type subsidies. Even assuming that the "30-and-Out" benefit contains an early retirement subsidy, Whisman's argument is unpersuasive, because § 1054(g) and *Constantino* involve *a reduction or elimination of accrued benefits and retirement-type subsidies, not a suspension*, as is the case here.

*Whisman*, 55 F.3d at 1147 (emphasis added and footnote omitted). The court went on to conclude that Whisman would have lost even under the unamended plan. *Id.* While the majority dismisses *Whisman* as reaching its conclusion without analysis, perhaps the *Whisman* court thought that its conclusion was obvious from the plain meaning of § 1054(g).

The majority also seeks to rebut *Spacek*'s reliance on Treasury Regulation 26 C.F.R. § 1.411(c)-1(f) to establish that *normal* retirement benefits are not protected against suspension by amendment. The point *Spacek* makes is that, if normal retirement benefits are not protected, it is most unlikely that early retirement benefits would be protected.

Initially, to gain some perspective on the status of early retirement benefits in relation to normal retirement benefits, one should recognize that early retirees—here only 39 years old—would be much more likely to go back to work in construction than people normally retiring in their sixties. Hence, it would not be at all surprising that "double-dipping" by early retirees would, perhaps for reasons of the financial integrity of the plan, be dealt with more severely (and certainly not less severely) than would re-employment in the industry by workers retiring at a normal (and relatively advanced) age.[2] It would ap-

---

[2] The exceptions in the anti-cutback rule, permitting an amendment that decreases accrued benefits in the cases of "substantial business hardship" or termination of a pension plan, deal more with business problems facing the firm sponsoring the plan and not the internal financial integrity of a plan that might be affected by "double-dipping" even in good economic times. Because suspensions do not decrease accrued benefits, *see infra* slip op. at 29, ERISA allows plan administrators more flexibility in adjusting the provisions for suspensions to maintain the financial integrity of pension plans. Under the majority's approach that would lim-

(continued...)

pear more likely that normal retirees would be allowed to retain their pension payments than would early retirees.[3] So one might logically expect employment restrictions on early retirees to be more onerous than those on normal retirees.

The Retirement Equity Act (REA), however, added the language of § 1054(g)(2), and, as *Spacek* states, "The legislative history of the REA indicates that the fundamental purpose behind the addition of paragraph (2) was to afford early retirement benefits and retirement-type subsidies the same form of protection from reduction by amendment afforded to accrued benefits." I am therefore in accord with *Spacek*'s conclusion that, if an amendment, such as the one at issue here, would not violate § 1054(g) if it were applied to suspend fully accrued benefits, it plainly cannot violate § 1054(g) if applied to early retirement benefits. *Spacek*, in reaching that conclusion, starts with the proposition from the applicable treasury regulation that, "for the purposes of computing the actuarial equivalent of a retirement benefit available at normal retirement age, '[n]o adjustment of any accrued benefit is required on account of any suspension of benefits if such suspension is permitted under section

---

[2] (...continued)
it the availability of adjustments in suspensions to "substantial business hardship" or termination of a plan, the plan administrator loses such flexibility.

[3] The significance of age in the policy of retirement systems towards retirees' receipt of earnings is exemplified by the rules of the Social Security system. Retired persons, aged 65 to 70, lose their benefits if their earned income exceeds a stipulated amount, but, after they reach age 70, they are allowed to keep all their earnings in addition to their benefits. *See* Soc. Sec. Admin. Pub. No. 05-10069 (March 2002). One may surmise that pensioners are more likely to have significant earnings before age 70 than after.

203(a)(3)(B) of the Employment Retirement Income Security Act of 1974 [29 U.S.C. § 1053(a)(3)(B)].'" *Spacek*, 134 F.3d at 290 (quoting 26 C.F.R. § 1.411(c)-1(f)). Therefore, in figuring a plan participant's accrued benefit, where early retirement benefits are involved, the calculation of the accrued benefit need not account for the decrease in total benefits paid as a result of a suspension authorized by 29 U.S.C. § 1053(a)(3).

*Spacek* then notes the authorization under § 1053(a)(3)(B) of suspension of accrued benefits based on certain employment—as is the case here. At this point, *Spacek* goes on to conclude that an authorized suspension does not decrease accrued benefits. And, as earlier noted, to the extent that an amendment would not violate the anti-cutback provision rule if applied to fully accrued benefits, such an amendment cannot, based on the demonstrated intent of Congress, violate the rule if applied to early retirement benefits. The logic here seems inescapable.

As far as I can divine, the majority's effort at refutation involves a simple attempt at bootstrapping. The majority says that the *Spacek* reasoning is inconsistent with the language of paragraph (2) of the anti-cutback rule, apparently because this provision requires that amendments that have the effect of eliminating or reducing early retirement benefits should be treated as reducing accrued benefits. Slip op. at 18. But, as has been demonstrated earlier, a "suspension" is not a "reduction" (although the majority would have it otherwise), and the alleged inconsistency therefore disappears. As far as I can determine, the remainder of the majority's argument involving accrued benefits continues to rely on the false equation of "suspension" with "reduction."

The majority also adds the point that, even though a suspension of benefit payments may not decrease accrued benefits (or become a forfeiture), a change in the rules

governing suspensions may indeed decrease benefits. Slip op. at 20. This argument misses the mark because the provisions we are discussing are directed to what is permissible for *changes* in the plan. To change the rules governing suspensions is merely to create a suspension with a little different design than an earlier one. The rules addressing the consequences of invoking a suspension necessarily encompass changes leading to a new form of suspension.

The majority's reliance on 26 C.F.R. § 1.411(d)-4 interpreting 26 U.S.C. § 411(d)(6), an analogous anti-cutback rule in the Internal Revenue Code, is also unconvincing. Nothing in this regulation refers to a suspension or anything resembling a suspension. The majority seems to be arguing that the amendment under consideration here had something to do with "increasing conditions." But there is no indication that anything in the cited regulation is relevant to the conditions of a suspension. Rather, the bar against "increasing conditions" appears to be a bar against increasing eligibility requirements for pension participation. *See* 26 C.F.R. § 1.411(d)-4 Q&A-6 (asking and answering whether a plan may "condition the availability of a section 411(d)(6) protected benefit on the satisfaction of objective conditions that are specifically set forth in the plan"). We have already held that a change in eligibility requirements could violate the anti-cutback rule. *See Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1036-37 (7th Cir. 1996) (so holding). But the Internal Revenue Manual discussed in footnote 17 of the majority opinion states unequivocally that an amendment pursuant to ERISA § 203(a)(3)(B), 29 U.S.C. § 1053(a)(3)(B), suspending benefits payments for periods of employment, as here, does not violate the anti-cutback rule of § 411(d)(6). The majority has nothing better to point out in refutation than a clumsy use of words in drafting some of the provisions of the manual. The intent of the manual provision, on the other hand, seems clear.

*Spacek*'s analysis relies on straightforward interpretations of statutory and regulatory language. The majority seeks to refute it with implausible and unconvincing arguments that do violence to the clear intent of the drafters.

As to considerations of policy and equity, it is true that my analysis may result in defeating in some instances the expectations of the plan participants. But this seems acceptable if they withdraw from retirement and return to the workforce, later to place additional demands upon the plan. They suffer no loss of regular income and are merely deprived of a bonus in the form of a dual recovery at the expense of the construction industry. Meanwhile, the financial integrity of the plan may be affected by continuing to make retirement provisions for participants who have not really retired.

I therefore respectfully dissent.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*