# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-4023 & 04-1375

RICHARD HERMAN, DANIEL PAULE,
LARRY ARWOOD, et al.,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*

CENTRAL STATES, SOUTHEAST
AND SOUTHWEST AREAS
PENSION FUND, FRED GEGARE,
JERRY YOUNGER, et al.,

*Defendants-Appellees,*
*Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1010—**Suzanne B. Conlon**, *Judge.*

_____

ARGUED APRIL 6, 2005—DECIDED SEPTEMBER 8, 2005

_____

Before BAUER, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.*   Richard Herman, Daniel Paule,
Larry Arwood, Dennis Helvey, William Rose, Michael
Krucker, Larry Whitmyer and William Bohan (the "plain-
tiffs") brought this action against the Central States South-
east and Southwest Areas Pension Fund (the "Pension

Fund") and several trustees of the Pension Fund (the "Trustees") for violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. They believe that their pension payments were reduced in a manner that violates the anti-cutback provisions of the statute. The district court granted the defendants' motion for summary judgment, but denied the defendants' motion for attorneys' fees. *See* 29 U.S.C. § 1132(g)(1). The plaintiffs appeal the district court's grant of summary judgment, and the defendants cross-appeal the denial of attorneys' fees. For the reasons set forth in the following opinion, we affirm the district court in all respects.

# I

# BACKGROUND

## A. Facts

The Pension Fund is a multiemployer pension plan within the meaning of ERISA. The Trustees have discretionary and final authority with respect to the administration of the Pension Fund and the construction of its terms.

This case involves the application of the anti-cutback provisions of ERISA to certain provisions of the plan governing the Pension Fund that deal with prohibited unemployment. The plaintiffs are participants of the plan who believe that their pensions were reduced by application of the reemployment provisions of the plan in a manner that violates the anti-cutback provisions. At the outset, therefore, we shall set forth the provisions involved.

On March 13, 2002, the Trustees amended the terms of the plan (the "March 2002 amendments"). These amendments became effective on July 1, 2002. For ease of reference, we

shall refer to the plan as it existed before the March 2002 amendments as the "Old Pension Plan" and to the plan as modified by the March 2002 amendments as the "New Pension Plan."

### 1. Prohibited Reemployment

At all relevant times, the plan has prohibited pensioners from working in prohibited reemployment. The plan defines "Prohibited Reemployment" as:

(1) Employment in any position, including a managerial or supervisory position, by a Contributing Employer . . .; or

(2) Employment by an employer, other than a governmental agency, in any position covered by a Teamster Contract between that employer and any affiliate of the International Brotherhood of Teamsters; or

(3) Employment in any position, including a managerial or supervisory position and including self-employment, but not including government employment, either in the same industry in which the Participant or Pensioner earned any Contributory Service Credit while covered by the Pension Fund, or in any other industry if the Participant or Pensioner is in the same job classification as are other Participants then employed by a Contributing Employer located within the same standard metropolitan statistical area [("SMA")].

R.68, Ex.D at 58-59.[1] The New Pension Plan employs the term "Teamster Industry Reemployment," R.68, Ex.H at 65, to cover the same activities that were termed "Prohibited Reemployment" under the Old Pension Plan, R.68, Ex.D at 58-59.

### 2. Reimbursement of Benefits Paid During Prohibited Reemployment

#### a. Under the Old Pension Plan

Under the Old Pension Plan, pensioners were penalized for working in prohibited reemployment. The following provisions governed:

(1) Section 4.13(a) of the Old Pension Plan provided: "A Pensioner shall have his benefit payments suspended for any calendar month in which he works in 'Prohibited Reemployment' . . . . A Pensioner shall permanently lose his rights to any benefit payments which are suspended because of his work in Prohibited Reemployment." *Id.* at 57.

(2) Section 4.13(c) of the Old Pension Plan required a

---

[1] The March 2002 amendments implemented some changes to the definition of prohibited reemployment; for instance, the requirement that a prohibited Teamster-covered job classification had to be in the same statistical metropolitan area was removed, and the government employment exception to prohibited reemployment was eliminated. The changes affected participants who retired on or after July 1, 2002. However, following our decision in *Heinz v. Central Laborers' Pension Fund*, 303 F.3d 802 (7th Cir. 2002), *aff'd*, 541 U.S. 739 (2004), the Trustees in January 2003 retroactively reinstated the prior definition of prohibited reemployment found in the Old Pension Plan. Therefore, the definition of prohibited reemployment has been the same at all times relevant to this action.

pensioner to notify the Pension Fund if he returned to work in any capacity and to inform the Pension Fund of information related to the pensioner's work (including the pensioner's specific job duties) so that the Pension Fund could determine whether the reemployment constituted prohibited reemployment. Furthermore, a pensioner could be requested "to certify, in writing, that he has not been working in any capacity which would result in the suspension of his benefit payments." *Id.* at 58. If a pensioner failed to furnish information related to his work, Old Pension Plan Section 4.13(c) also provided for benefits to be suspended until the required information was supplied.

(3) Under Section 4.13(m) of the Old Pension Plan, "[a] Pensioner who fail[ed] to notify the Pension Fund that he has returned to work in Prohibited Reemployment shall be obligated to reimburse the Pension Fund for all retirement pension benefit payments he received for any month, or part of a month, in which he was reemployed." *Id.* at 60.

(4) Old Pension Plan Section 7.05(a) made any misrepresentation in a claim for pension or other benefits grounds for recovery by the Pension Fund of any benefit payments made in reliance on the misrepresentation. Section 7.05(b) of the Old Pension Plan gave the Board the right to recover excess payments that had been made "due to a mistake." *Id.* at 69.

(5) Section 4.13(e) of the Old Pension Plan permitted a pensioner to request from the Pension Fund "a determination on whether the work he is contemplating shall result in the suspension of his benefit payments." *Id.* at 58.

### b. Under the New Pension Plan

The following provisions govern the same area under the New Pension Plan:

(1) Section 4.13(a) of the New Pension Plan provides:

> The Pension Fund shall permanently suspend all Periodic Benefit Payments of a Pensioner . . . during Periods of his Reemployment to the following extent:
>
> . . . .
>
>> (2) all Periodic Benefit Payments to a Pensioner shall be permanently suspended during all periods of [prohibited reemployment] . . . .

R.68, Ex.H at 62.

(2) Section 4.13(b) of the New Pension Plan requires Pension Fund participants, "as a prerequisite to any receipt of Periodic Benefit Payments, to keep the Pension Fund fully and promptly informed of any employment . . . in which he was or is engaged during any time period for which he claims or has received Periodic Benefit Payments." *Id.* at 63. New Pension Plan Section 4.13(b) also notes that the Pension Fund could require pensioners to provide information about past and present employment and could require signed responses from pensioners regarding whether a pensioner was engaged in prohibited reemployment.

Under the New Pension Plan, failure to comply with these disclosure obligations would result in temporary suspension of benefits. In such a case, however, the New Pension Plan states that, upon the pensioner's compliance with the disclosure obligations, "his Periodic Benefit Payments will be resumed (including full restoration of all payments that had been temporarily suspended) unless there is then in effect a permanent suspension of his Periodic Benefit Payments . . . ." *Id.*

On the other hand, with respect to the "permanent suspension" just mentioned, the New Pension Plan provides that:

> [a]ny failure . . . to comply with any disclosure obligation described in [Section 4.13(b)], or with any related disclosure request by the Pension Fund, shall, if the Pensioner has been or is engaged in any Reemployment, create a rebuttable presumption of an existing factual basis . . . for a permanent suspension of the Pensioner's Periodic Benefit Payments during all periods of his Reemployment, provided that such presumption will become inoperative if and to the extent the presumption is rebutted by clear and convincing evidence or is otherwise shown to be unreasonable under the circumstances. . . . Each such permanent suspension of the Periodic Benefit Payments shall continue in effect and until the Pension Fund has received what it determines to be both notice and clear and convincing evidence that the basis for the permanent suspension is no longer applicable, at which time the suspension will be ended and the Periodic Benefit Payments will be resumed on a prospective basis only (without any restoration of payments for the period prior to that end of the suspension), subject to possible offset pursuant to [Section 4.13(e)].

*Id.* at 62-63.

(3) Section 4.13(e) of the New Pension Plan states that "[t]he Pension Fund is entitled to restitution of all Periodic Benefit Payments that are distributed to a Pensioner . . . for any period . . . for which the Pensioner . . . was not entitled to receive such payments." *Id.* at 64. *Section 4.13(e) allows the Pension Fund to obtain restitution by making an "offset or deduction" consisting of one hundred percent of the gross amount of the first three benefit payments following the end*

*of a suspension, and twenty five percent of the gross amount of each benefit payment thereafter. Id.*

According to New Pension Plan Section 4.13(f), a pensioner can "submit a written request to the Pension Fund at any time for a determination whether or not specific employment" constitutes prohibited reemployment. *Id.*

## B. District Court Proceedings

The plaintiffs filed this action on February 11, 2003, based on the March 2002 amendments to the plan and on the termination of individual plaintiffs' benefits (claims which we discuss in further detail below). The plaintiffs' first amended complaint advanced seven counts. Against the Trustees, the plaintiffs alleged breach of fiduciary duty; violation of ERISA's anti-cutback rule, *see* 29 U.S.C. § 1054(g)(1); and violation of ERISA's offset rules, *see* 29 C.F.R. § 2530.203-3(b)(2)-(3). Against the Pension Fund, the plaintiffs sought injunctive and declaratory relief based on the plaintiffs' individual benefit determinations, *see* 29 U.S.C. §§ 1132(a)(1)(b), 1132(a)(3), and sought damages for violation of ERISA notice provisions, *see id.* § 1054(h)(1)-(2), and violation of ERISA claims procedures, *see* 29 C.F.R. §§ 2530.203-3(b)(6), 2530.503-1(b). The first amended complaint also alleged that the Trustees interfered with the plaintiffs' rights protected under ERISA in order to improve its financial condition, *see* 29 U.S.C. § 1140; the district court dismissed this count with prejudice before the case reached the summary judgment stage.

The Pension Fund moved for summary judgment, and the district court granted its motion. The district court deemed the claims related to ERISA's offset rules and claims procedures to have been abandoned, on the ground that the plaintiffs failed to address either claim in their response

brief. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2002).

The district court then turned to the plaintiffs' claims, based on the March 2002 amendments, concerning the Pension Fund's ability to obtain reimbursement of benefits paid to a pensioner while he was engaged in prohibited reemployment.[2] The court determined that the amendment was entirely consistent with earlier summary plan descriptions ("SPDs") allowing for reimbursement from future benefits. Therefore, the court reasoned, the anti-cutback rule was not implicated. Furthermore, because the March 2002 amendments did not violate the anti-cutback rule, the court also determined that the plaintiffs' claim for breach of fiduciary duty, as well as their claim that ERISA's notice requirements had been violated, failed as well.

The court next considered the claim that individual plaintiffs' benefits wrongfully had been denied. The court reviewed the denial of benefits according to an arbitrary and capricious standard because the plan governing the Pension Fund gave discretionary authority to the administrator in making benefit determinations. The court determined that none of the benefit denials had been arbitrary or

---

[2] With respect to the plaintiffs' claims based on the March 2002 amendments as they related to the definition of prohibited reemployment (amendments that were nullified when the definition of prohibited reemployment contained in the Old Pension Plan retroactively was reinstated), the district court determined that all the plaintiffs except one lacked standing to mount a challenge to the amendments. The court further found that the sole plaintiff with standing had failed to exhaust available administrative remedies. Therefore, the court did not discuss further the claims based on the repealed amendments to the definition of prohibited reemployment.

capricious because there was no evidence that the defendants' stated reasons for denying benefits were false and no evidence that the trustees had interpreted plan terms in contravention of the plan's plain meaning.

After the district court's summary judgment decision, the Trustees and the Pension Fund sought an award of attorneys' fees. *See* 29 U.S.C. § 1132(g)(1). The district court denied the motion. The district court determined that the plaintiffs had brought their claims in good faith. The court refused to infer bad faith from the defendants' allegations that the plaintiffs' claims had been brought for political reasons because, although the litigation was contentious, the plaintiffs made consistent arguments throughout the case and "did not stubbornly attempt to relitigate failed claims." R.109 at 1.

Furthermore, the court concluded that the plaintiffs' suit was "neither frivolous nor vexatious"; rather, it was substantially justified. *Id.* The court reasoned that the plaintiffs' "lack of success does not suggest [their] claims had no basis in law or fact." *Id.* Indeed, in the court's view, the challenge to the amended reimbursement provisions was based on a plausible construction of ERISA.

## II

## DISCUSSION

### A.  Claims Based on the March 2002 Amendments

#### 1.  Standard of Review

We review de novo the district court's grant of summary judgment. *Ruttenberg v. United States Life Ins. Co.*, 413 F.3d 652, 658-59 (7th Cir. 2005).

### 2. ERISA's Anti-Cutback Rule

According to ERISA's so-called "anti-cutback rule," "[p]lan amendments are permitted . . . , but an amendment may not decrease benefits that have already accrued." *Heinz v. Cent. Laborers' Pension Fund*, 303 F.3d 802, 804 (7th Cir. 2002). The rule derives from 29 U.S.C. § 1054(g)(1), which provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." "Accrued benefit" means, "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." *Id.* § 1002(23). Furthermore, the statute provides that "a plan amendment which has the effect of . . . eliminating or reducing an early retirement benefit or a retirement-type subsidy . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." *Id.* § 1054(g)(2); *see also Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1034 (7th Cir. 1996) (determining that early retirement benefits are "accrued benefits" within the meaning of ERISA).

The plaintiffs argue that the March 2002 amendments violate the anti-cutback rule because Section 4.13(e) of the New Pension Plan allows the Pension Fund to recover a greater amount of benefits paid in error than was allowed under Section 4.13(a) of the Old Pension Plan. Specifically, they argue that their accrued benefits are being reduced because the offset allowed by New Pension Plan Section 4.13(e) makes it more difficult to receive the payments. The Pension Fund, on the other hand, contends that the Old Pension Plan permitted precisely the same recovery of wrongfully paid benefits that is allowed under the New Pension Plan.

In our view, the March 2002 amendments did not change a participant's entitlement to benefits under the plan. Both

the Old Pension Plan and the New Pension Plan suspend a pensioner's benefits in any month in which he engages in prohibited reemployment. As well, both Old Pension Plan Section 4.13(c) and New Pension Plan Section 4.13(b) allow the Pension Fund to suspend benefits payments when a pensioner fails to certify that he has not been working in prohibited reemployment or when he fails to provide requested information about his employment activities. Moreover, both before and after the March 2002 amendments, the plan permitted the Pension Fund to recover any benefits that had been paid in error. The result—that the Pension Fund can recover benefits paid in error—is the same despite the fact that the Old Pension Plan simply stated that the Trustees had "the right to recover" "benefit payments exceeding the amount determined by the provisions of [the] Pension Plan" that were "made . . . due to mistake," R.68, Ex.D at 69, whereas the New Pension Plan authorizes "restitution" of payments that the pensioner "was not entitled to receive," according to the schedule set forth in Section 4.13(e), R.68, Ex.H at 64. The March 2002 amendments do not make ineligible for benefits any person who would have been eligible prior to the changes. The amendments simply prevent a pensioner from receiving a windfall to which he has no right.

This reading is consistent with pre-2002 Pension Fund SPDs that emphasized recoupment as a possibility if benefits are paid in error. For instance, an SPD issued in 2000 and provided to participants in the Pension Fund stated: "If you are working in Prohibited Reemployment your pension benefits *will be suspended* until you stop working. Additionally, your future benefits may be *reduced* to reimburse the Plan for any benefits improperly paid to you while you worked in Prohibited Reemployment." R.98, Ex.C at 28 (emphasis in original). In light of all the evidence

which we have reviewed, we conclude that the March 2002 amendments, as they relate to recoupment of wrongfully paid benefits, violate neither the plain wording nor the purpose of the anti-cutback rule.[3]

## B.  The Individual Plaintiffs' Claims

Four of the plaintiffs—Mr. Helvey, Mr. Paule, Mr. Arwood and Mr. Rose, all retirees—have had their benefits terminated and seek to recover the benefits lost. We shall review the circumstances surrounding the termination of each man's benefits in greater detail below.

### 1.  Standard of Review

If, as was the case here, the administrator of a pension fund is granted discretion in making benefit determinations,

---

[3]  ERISA provides that a pension plan "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless . . . the plan administrator provides . . . notice." 29 U.S.C. § 1054(h)(1). The notice must meet the following requirements: It must "be written in a manner calculated to be understood by the average plan participant and shall provide sufficient information . . . to allow applicable individuals to understand the effect of the plan amendment." *Id.* § 1054(h)(2).

The plaintiffs submit that the notice provided to them of the March 2002 amendments—in this case, several pages in a newsletter that was distributed by bulk mail—was not sufficient to satisfy ERISA's requirements.

Because we hold that the March 2002 amendments did not reduce participants' benefits, let alone work "a significant reduction in the rate of future benefit accrual," *id.* § 1054(h)(1), the notice requirements laid out in § 1054(h)(2) are not implicated in this case, and we need not reach this question.

then a reviewing court is limited to asking whether the decision to deny benefits was arbitrary or capricious. *See Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 856 (7th Cir. 2002). Under the arbitrary and capricious standard, we will overturn a plan administrator's decision "only . . . if it is downright unreasonable." *Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (internal quotation omitted), *cert. denied*, 529 U.S. 1068 (2000). That is, this court will not substitute the conclusion it would have reached for the decision of the administrator, as long as "the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts." *Id.*

This court has noted that "[r]eview under the deferential arbitrary and capricious standard is not a rubber stamp," so that, "[e]ven under the deferential review we will not uphold a termination where there is an absence of reasoning in the record to support it." *Hackett v. Xerox Corp. Long-Term Disab. Income*, 315 F.3d 771, 774-75 (7th Cir. 2003). A satisfactory explanation is one that gives "the specific reasons for the denial," but it need not explain "the reasoning behind the reasons, . . . [that is,] the interpretive process that generated the reason for the denial." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996) (internal quotation omitted), *cert. denied*, 521 U.S. 1129 (1997). The administrator of a pension fund does not act arbitrarily and capriciously when he changes a previous decision because the facts known to the plan have changed; "[p]ut simply, a reversal based on new information is not a non-uniform interpretation." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 690 (7th Cir.), *cert. denied*, 125 S. Ct. 106 (2004).

## 2. The Individual Plaintiffs

The plaintiffs challenge the denial of benefits to three individuals: Mr. Helvey, Mr. Paule and Mr. Rose.[4] Before discussing the circumstances of each individual's denial of benefits, we briefly shall review the process by which the Pension Fund determines that an individual is engaged in prohibited reemployment.

Under both the Old Pension Plan and the New Pension Plan, pensioners are required to notify the Pension Fund if they become employed in any capacity. The Pension Fund also monitors pensioners' reemployment through its own efforts. Prior to 2002, the Pension Fund sent what it calls "standard screening cards," R.68 at 9, to randomly selected pensioners to determine whether the pensioner was reemployed. However, beginning in 2002, the Pension Fund began sending more detailed "questionnaires," *id.*, to pensioners concerning reemployment. Mr. Herman, Mr. Paule and Mr. Rose all suffered a termination of their benefits based on their responses to the Pension Fund's 2002 questionnaires.

### a. Mr. Helvey and Mr. Paule

Mr. Helvey had worked as a dockworker when he earned credit with the Pension Fund, and he became reemployed with a building supply company. Based on Mr. Helvey's responses to a March 2002 questionnaire, the Pension Fund notified him that he was engaged in prohibited reemploy-

---

[4] In the section of their brief concerning the individual benefit determinations, the plaintiffs also mention Mr. Arwood. However, neither party directs any arguments towards him. Therefore, we shall not discuss him.

ment because he was in the same job classification in which other participants were employed by a contributing employer in the same SMA. R.68, Ex.M at 6. Ultimately, Mr. Helvey was given approval from the Pension Fund to continue to work for the company with whom he had sought reemployment, as long as he did not work with stocking, repairing, or driving; he was limited to janitorial duties.

Mr. Paule worked as a driver for a plumbing supply company when he earned credit with the Pension Fund, and he later became reemployed with a plumbing company. At the plumbing company, he did "building maintenance, inventory control, lawn and garden, and custodian/janitor duties." R.68, Ex.K at 1. Based on Mr. Paule's responses to a February 2002 questionnaire, the Pension Fund notified him that he was engaged in prohibited reemployment because he was working "in the same industry in which Mr. Paule . . . earned any Contributory Service Credit." *Id.* at 4 (alterations in original; internal quotations omitted).

The plaintiffs allege that it was inconsistent for the Pension Fund to permit Mr. Helvey to *continue* working as a janitor, while Mr. Paule, who also did work involving custodial or janitorial duties, was deemed to be in prohibited reemployment, when the two men worked in the same SMA. The Trustees contend that the plaintiffs' arguments obscure the key differences between the terminations of benefits for Mr. Helvey and Mr. Paule. Mr. Paule's benefits were terminated for prohibited reemployment because he was working in the same industry in which he had worked when he earned credit with the Pension Fund; Mr. Helvey, on the other hand, had been subject to termination of benefits for working in the same job classification as other plan participants in the same SMA.

We must conclude that the Pension Fund has given a specific reason for its denial, and one that is supported reasonably by the evidence. *See Gallo*, 102 F.3d at 922.

### b.  Mr. Rose

In 2000, Mr. Rose notified the Pension Fund that he was reemployed in building maintenance. Based on this representation, the Pension Fund notified Mr. Rose that his reemployment was not prohibited. The Pension Fund also received one screening card from Mr. Rose indicating that his job was in building maintenance. However, in April 2002, Mr. Rose filled out a questionnaire providing specific details about his job duties and indicating that he was working in plant maintenance, not building maintenance. According to the information Mr. Rose provided, his job duties included "service, repair and upkeep of . . . production equipment, . . . participat[ion] in installation of all equipment . . . , . . . upkeep and maintenance of the building and the grounds, and . . . maint[enance of] inventories." R.68, Ex.J at 2. Based on Mr. Rose's responses to the questionnaire, the Pension Fund determined that Mr. Rose was engaged in prohibited reemployment because "plant maintenance" is a job classification in which other participants were employed by a contributing employer in the same SMA. *See id.* at 3 (noting that "Mr. Rose is working in the same job classification as other Participants employed by a Contributing Employer . . . in the same [SMA]," and identifying collective bargaining agreement governing those jobs).

Mr. Rose contends that the difference between "plant maintenance" and "building maintenance" is ambiguous. The Trustees contend, simply as a matter of fact, that "plant maintenance" is covered by a participating employer, while

"building maintenance" is not. They claim that Mr. Rose's failure to disclose that he worked in "plant maintenance" is a misrepresentation and grounds for denial of benefit.

It is within the bounds of the arbitrary and capricious standard for the Pension Fund to have changed from a determination that Mr. Rose was permissibly reemployed in "building maintenance," to the determination that he was engaged in prohibited reemployment in "plant mainte-nance," based on the more complete information provided in response to the May 2002 questionnaire. *See Militello*, 360 F.3d at 690. Furthermore, the fact that other participants were employed by a contributing employer in the same SMA is a specific and reasonable ground on which to base the denial of benefits. The Pension Fund need not explain the reasoning behind their reason for denying Mr. Rose's benefits. *See Gallo*, 102 F.3d at 922. To the extent that the Pension Fund seeks to recoup benefits paid to Mr. Rose while he was engaged in prohibited reemployment, we note that the Pension Fund consistently has maintained its right to recover payments made based on a participant's misrep-resentation. *See* R.68, Ex.D at 69.

## C. Violation of Fiduciary Duty

The plaintiffs submit, based both on the March 2002 amendments to the Plan and on the individual benefit determinations just discussed, that the Trustees failed to fulfill their duties as fiduciaries. "ERISA requires a trustee or other fiduciary to administer a plan 'solely in the interest of the participants and beneficiaries' of the plan." *Frahm v. Equitable Life Assur. Soc. of the United States*, 137 F.3d 955, 958 (7th Cir.) (quoting 29 U.S.C. § 1104(a)(1)), *cert. denied*, 525 U.S. 817 (1998). The fiduciary duty of a plan administrator "is to implement faithfully the provisions of

the plan as written." *White v. Sundstrand Corp.*, 256 F.3d 580, 583 (7th Cir.), *cert. denied*, 534 U.S. 1066 (2001). This duty also implicates "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation." *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996). *Cf. Frahm*, 137 F.3d at 960 ("[C]laims that one or another bit of advice was misleading do not violate [29 U.S.C. § 1104(a)(1)].").

The plaintiffs submit that the Trustees violated their fiduciary duties by failing to disclose key details about the Plan, by leaving important terms undefined and by interpreting those terms inconsistently. They contend that they were met with "a bewildering and forbidding thicket" when they attempted to ascertain whether they could enter re-employment. Appellants' Br. at 38.

No breach of fiduciary duty occurred in this case. We have just explained that the March 2002 amendments did not violate ERISA's anti-cutback or notice rules and that the individual benefit determinations discussed above were not arbitrary and capricious. Absent in this case is the sort of "deliberate misleading" to which we referred, in *Sprague v. General Motors Corp.*, 133 F.3d 388, 405 (7th Cir.), *cert. denied*, 524 U.S. 923 (1998), as distinguishing a breach of fiduciary duty. Thus, we can see no basis on which to conclude that the Trustees breached their fiduciary duty.

We also note that the Supreme Court has cautioned against using the action for breach of fiduciary duty under ERISA to litigate "ordinary benefit claims": "[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' " *Varity*, 516 U.S. at 514-15.

### D. Attorneys' Fees

The Pension Fund and the Trustees contend that the district court erred in denying their motion for attorneys' fees. We review a district court's decision to deny attorneys' fees for an abuse of discretion. *See Senese v. Chicago Area Int'l Bhd. of Teamsters Pension Fund,* 237 F.3d 819, 826 (7th Cir. 2001).

ERISA grants the district court discretion to award attorneys' fees to either party. *See* 29 U.S.C. § 1132(g)(1); *see also Senese,* 237 F.3d at 826. This court has noted that "[t]here is a 'modest presumption' in favor of awarding fees to the prevailing party, but that presumption may be rebutted." *Senese,* 237 F.3d at 826 (quoting *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.,* 57 F.3d 608, 617 (7th Cir. 1995)).

This court has recognized two tests for whether attorneys' fees should be awarded or denied. Under the first test, which the district court applied in this case, "[a]n award of fees to a successful defendant may be denied if the plaintiff's position was both 'substantially justified'—meaning something more than non-frivolous, but something less than meritorious—and taken in good faith, or if special circumstances make an award unjust." *Id.* (quoting *Harris,* 57 F.3d at 616-17 & n.4).

Under the second test, the court looks to five factors:

> (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions.

*Brewer v. Protexall, Inc.*, 50 F.3d 453, 458 (7th Cir. 1995) (internal quotation omitted). "[B]oth tests . . . ask the same question: was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998) (internal quotation omitted).

In addressing the motion for attorneys' fees brought by the Trustees and the Pension Fund, the district court followed exactly that test; it looked at whether the plaintiffs' position was substantially justified and whether it was taken in good faith. The Trustees and the Pension Fund, however, contend that the district court abused its discretion by denying fees. The crux of the defendants' position is that the plaintiffs were motivated by political considerations in bringing and pursuing the present case.

We shall defer to the district court's exercise of its discretion regarding attorneys' fees. The district court had the benefit of witnessing the development of the litigation and the interaction between the parties, and it concluded that the discovery disputes in the case did not evidence that the lawsuit was brought merely as politically motivated harassment. Furthermore, the district court concluded that the lawsuit sought "resolution of a genuine dispute" and had a reasonable basis in law and fact. R.109 at 1. That conclusion was within the court's discretion. Therefore, we shall affirm the district court's decision to deny attorneys' fees.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*